David P. MAYER, Plaintiff-Appellee,

v.

Steve ANGELICA, Defendant-Appellant.

Nos. 84–2053, 84–2388.

United States Court of Appeals, Seventh Circuit.

Argued May 22, 1985.

Decided May 14, 1986.

Rehearing and Rehearing En Banc Denied June 19, 1986.

John W. Nelson, Wise & Nelson, Los Angeles, Cal., for defendant-appellant.

Yvonne M. Homeyer, Chapman & Cutler, Chicago, Ill., for plaintiff-appellee.

Before WOOD and FLAUM, Circuit Judges, and WYATT, Senior District Judge.*

WYATT, Senior District Judge.

Defendant-appellant Steve Angelica appeals from orders directing judgments against him by the district court after jury trial of this civil action. The verdict was in favor of plaintiff-appellee David P. Mayer, but, as will be seen, was ambiguous and raised a number of questions. The claims made by Mayer were for damages for violation of the "Racketeer Influenced and Corrupt Organizations Act" ("RICO"; 18 U.S.C. §§ 1961–1968), for violation of an Illinois Statute, and for common law fraud.

Whatever the differing legal theories of the several claims, the factual basis alleged for each was the same: that defendant Kimberly International Gem Corporation ("Kimberly"), acting through defendant Rene Dupont, intended to deceive plaintiff and as part of a scheme to defraud him, knowingly made false representations to plaintiff and induced him to buy from Kimberly a number of gemstones for about $90,000; that the false representations so made were as to the quality, value, resale possibilities, and otherwise, of such gemstones; that the individual defendants conducted and participated in Kimberly's business and affairs through wire and mail fraud acts which constituted a pattern of racketeering activity; and that plaintiff was greatly damaged by the acts of defendants.

The judgments against Angelica were in the aggregate for nearly $900,000.

The argument for Angelica to this court is principally that prejudicial evidence was erroneously admitted against him, and that acceptance of the verdict by the trial court was also error because that verdict was inconsistent, uncertain, and ambiguous.

Because evidence prejudicial to appellant Angelica was erroneously admitted, we reverse the judgment appealed from and remand the action to the district court for a new trial as to the claims against Angelica. Further, we do not approve of the procedure followed by the trial court in accepting the verdict, nor of the verdict forms used and the instructions as to punitive

---

* The Honorable Inzer B. Wyatt, Senior District Judge for the Southern District of New York, is sitting by designation.

damages in that connection, nor of the failure to instruct the jury on one of the four claims submitted to it, nor of the judgments entered on the verdict. Whether these further matters would themselves require reversal need not be decided because the erroneous admission of prejudicial evidence itself requires a new trial.

The nature of the litigation and the complexity of the proceedings below call for an explanation of some length.

### 1.

The action was commenced on June 6, 1983, in the United States District Court for the Northern District of Illinois at Chicago. There were five claims stated in the five counts of the complaint. Each claim was based on the same alleged facts, these being set out as paragraphs 16 through 55 of Count I and simply being realleged in the other four counts. Jurisdiction was said to be based on 18 U.S.C. § 1964(c) (a part of RICO, as will appear) and on 28 U.S.C. §§ 1331 (federal question) and 1332 (diversity of citizenship).

Plaintiff David P. Mayer was alleged to be a resident of Chicago (and presumably domiciled in and a citizen of Illinois).

The named defendants are two alleged California corporations and eleven individuals.

The two alleged California corporations are Kimberly International Gem Corporation ("Kimberly") and International Gemological Society ("IGS"). It may be doubted that IGS is a corporation. An affidavit of defendant Harvey B. Levitt, sworn to July 22, 1983, states that he is "an individual doing business as" IGS in Orange County, California.

The eleven individual defendants are each alleged to be a resident of California (and presumably domiciled in and a citizen of California). Two of the named defendants are Alan Babs and Bill Burns; these turn out to be pseudonyms for appellant Angelica, also named as a defendant. One of the named defendants is Rene Dupont; this is a pseudonym for Rene Small, but as Rene Small is usually referred to in the record as "Rene Dupont," he will be so referred to here. One of the named defendants was Marsha Keane; this is a pseudonym for Marsha Zvonkin, who will be referred to as "Zvonkin." There were thus nine individual defendants in the complaint as filed, disregarding the two pseudonyms for the also named Angelica. These nine individual defendants, in the order named, were Anita Kimball, Steve Angelica, Rene Dupont (Rene Small), Marsha Keane ("Zvonkin"), Steve Small, Harvey B. Levitt, Henry O. Terry, Robert MacAllum, and Frank Kimball.

### 2.

Count I is a claim for damages under 18 U.S.C. §§ 1962(c) and 1964(c), part of RICO, which in turn is part of the Organized Crime Control Act of 1970. Count I is described in the complaint as the "Rico Violation."

Six transactions are alleged as the basis for Count I. They all are stated in the complaint as involving false representations to Mayer in the sale to him by Kimberly of gems by telephone and by mail. The time of the six transactions was between August 1982 and January 1983. The person alleged to have made the representations was Dupont, except that as to one transaction the representations are alleged (para. 43) to have been made by Bill Burns (Angelica), Steve Small, and Dupont.

According to the complaint, Mayer, by the telephoned oral representations of Dupont (with the one exception noted), was induced to buy gems from Kimberly and to pay prices for them as follows:

| | |
|---|---|
| five natural sapphires | $ 3,575.00 |
| one natural sapphire | $10,000.00 |
| one natural Malaya garnet | $ 3,442.50 |
| one natural tourmaline | $30,000.00 |
| one golden sapphire | $30,000.00 |
| one green peridot | $14,430.00 |

So far as appears from the complaint, Mayer never knew any of the defendants, nor ever saw them, nor ever talked to them face to face. Everything was done by telephone and by mail, the defendants never came to Chicago; Mayer never went to California.

The averments as to the six transactions contained in paragraphs 16 through 55 of Count I are alleged as the basis also for Counts II through V, presented as separate claims under separate and different legal theories.

Count II, described in the complaint as "Rico Conspiracy," is a claim for damages under 18 U.S.C. §§ 1962(d) and 1964(c). There are no dates given in the complaint for the claimed conspiracy. The dates in the complaint for the purchases are August and September 1982 (para. 18) through January 1983 (paras. 47, 50). These dates are given in Count I, the Rico Violation count. In Count II, the Rico Conspiracy count, there are no dates alleged for the beginning and end of the claimed conspiracy. The earlier paragraphs are merely realleged, after which it is averred that each defendant "conspired to conduct and participate in conducting Kimberly's business and affairs through the aforesaid pattern of racketeering activity" (Complaint, Count II, para. 41). The relevant dates for the conspiracy alleged are thus from August 1982 through January 1983.

Count III, described in the complaint as "common law fraud," is a claim for damages as so described.

Count IV, described in the complaint as "breach of contracts" is a claim for damages as so described. The averment is (para. 42) that "Kimberly breached its agreements," but judgment is demanded against "the Defendants."

Count V, described in the complaint as "Illinois Consumer Fraud and Deceptive Business Practices Act" is a claim for damages under Section 2 of the Illinois Act as so described (Ill.Rev.Stat. ch. 121½, § 262).

Damages were asked separately on each count and were asked with great particularity, distinguishing between "actual damages" and "punitive damages."

The damages on Counts I and II were asked in the same words and were in those words as follows:

a) $90,000 actual damages increased threefold to $270,000;

b) Lost profits of $20,000 increased threefold to $60,000;

c) Equitable relief; and

d) The cost of the lawsuit and reasonable attorney's fees.

The damages on Count III were asked in these words:

a) $90,000 actual damages;

b) Lost profits of $20,000;

c) Punitive damages in the amount of $1,200,000; and

d) The cost of the lawsuit and reasonable attorney's fees.

The damages on Counts IV and V were asked in the same words and were in those words as follows:

a) $90,000 actual damages;

b) Lost profits of $20,000;

c) Equitable relief; and

d) The cost of the lawsuit and reasonable attorney's fees.

In Count V, a subparagraph (e) was added in which it was asked in the usual form for "such other and further relief," etc.

It is important for this appeal to note that no punitive damages are asked on Counts I, II, IV and V; only "actual damages" are asked on those counts and in those exact words. Punitive damages are asked *only* on Count III, and on Count III "actual damages" are also asked and in those exact words.

### 3.

Motions were made by several of the defendants to dismiss the action for want of jurisdiction or to transfer the action to the Southern District of California under 28 U.S.C. § 1404(a) for the convenience of parties and witnesses. In opposition to the motion, an affidavit of Mayer, sworn to August 17, 1983, was submitted. In this affidavit, Mayer purports to state under oath how the gem purchases by him from Kimberly were initiated, induced and carried out. Considering that subsequently, after a jury verdict, an order had been made directing judgment against Angelica for actual damages, as trebled, of $309,000 and punitive damages of $500,000, it would

be supposed that Mayer would have named Angelica as the most active of those causing his loss. On the contrary, according to the Mayer affidavit, the transactions were with Rene Dupont; the only mention by Mayer of the name Angelica is (para. 12): "In May or June 1983, Steve Angelica called my home and left a message that he was an employee of Kimberly and that he wanted me to call him. I never returned the call." In contrast, Mayer states (para. 5): "In September, 1982 I agreed in a telephone conversation with Mr. Dupont to purchase five sapphires from Kimberly for $3,575.00." Mayer then states (para. 6): "Subsequent to my purchase of five (5) sapphires, I received numerous other telephone calls at my residence from Mr. Dupont between September 1982 and January 1983 in which he attempted to sell me additional gemstones." As a result of Mr. Dupont's calls, Mayer purchased the following stones which were alleged to have been represented to be:

| | |
|---|---|
| one blue sapphire | $10,000.00 |
| one Malaya garnet | $ 3,442.50 |
| one natural tourmaline | $30,000.00 |
| one golden sapphire | $30,000.00 |
| one green peridot | $14,430.00. |

Mayer further states: "Each transaction was substantially similar to my first purchase described in paragraph 5. In all these purchases, I dealt with Mr. Dupont over the telephone."

By orders dated October 21, 1983, and entered in the docket October 24, 1983, the district court denied the motions to dismiss or transfer the action.

### 4.

By order dated December 7, 1983, and docketed December 8, 1983, the trial judge set the trial for May 15, 1984.

It will appear that when trial of the action did begin on May 15, 1984—less than a year after the action had been commenced on June 6, 1983—only two individual defendants, appellant Angelica and Marsha Zvonkin, remained in the action out of the two corporations and nine individual defendants named in the complaint as filed. It should be explained how this came to be.

#### a.

Plaintiff filed on January 13, 1984, a motion to enter judgment of default in favor of plaintiff and against Harvey B. Levitt and IGS. This motion was granted by the trial judge by order dated January 13, 1984 and entered on the docket January 17, 1984. So far as appears, no judgment was then entered against either Levitt or IGS.

On January 20, 1984, there was filed a notice from the Bankruptcy Court for the Central District of California staying the action as to Harvey B. Levitt, who on December 20, 1983, had filed a petition in bankruptcy.

After trial an order was made by the trial judge as to Harvey B. Levitt which "dismissed [him] without prejudice with leave to reinstate when bankruptcy stay order has been lifted." The order was dated May 22, 1984, and was docketed May 23, 1984.

An order of the trial judge made after trial, dated May 22, 1984, and docketed May 23, 1984, recited: "Court enters default judgment in favor of plaintiff and against each of defendants ... International Gemological Society in the amount of $103,000 actual damages, trebled to $309,-000 plus punitive damages in the amount of $500,000."

#### b.

On February 17, 1984, plaintiff filed a motion to dismiss defendant Henry O. Terry without prejudice. This was said in the motion papers to be "pursuant to a Settlement Agreement and Covenant Not to Sue...." The terms of settlement were not given in the motion papers or anywhere else. It appears in the stenographic transcript (p. 516) that Terry paid $7,500 in settlement and agreed to testify for plaintiff.

An order was made by the trial judge dated February 22, 1984, docketed the same date, which, among other things, recites: "On plaintiff's motion, defendant

Henry O. Terry is dismissed without prejudice."

On May 30, 1984, plaintiff filed a motion to dismiss Henry O. Terry with prejudice. No explanation was given for the motion.

The trial judge made an order, dated May 30, 1984, docketed May 31, 1984, which recites: "Defendant Henry O. Terry is dismissed with prejudice."

c.

On motion of plaintiff, the district court, by order dated and docketed March 14, 1984, imposed sanctions on certain defendants for failure to comply with discovery. The order recited: "Answers of defendants Kimberly International Gem Corp., Steve Angelica, Rene Small, Steve Small and Robert MacAllum are stricken, and default judgment as to liability entered against each of said defendants."

Thereafter, Kimberly, Angelica, and Steve Small moved to set aside their defaults and to reinstate their respective answers. By order dated April 26, 1984, and docketed April 30, 1984, this motion was granted.

Rene Small (Rene Dupont) and Robert MacAllum did not move to set aside their defaults.

After trial an order was made dated May 22, 1984, and docketed May 23, 1984, which recited: "Complaint is amended on its face to correct the name of defendant Renee Small to Renee Small a/k/a Renee Dupont. Court enters default judgment in favor of plaintiff and against each of defendants, Renee Small a/k/a Renee Dupont, Robert McAllum ... in the amount of $103,000 actual damages, trebled to $309,000 plus punitive damages in the amount of $500,-000."

d.

On May 14, 1984, in the afternoon, Kimberly filed a bankruptcy petition in the Central District of California. This appears to have been disclosed to the Court in a motion filed by Angelica on May 15, 1984, seeking a continuance of the trial. The filing of the bankruptcy petition was said in the motion papers to cause an automatic stay of this action as against Kimberly, "a primary defendant in this case" (para. 10).

Under date of May 15, 1984, the district judge made a written order which, among other things, recited: "Defendant Kimberly International Gem Corp. dismissed without prejudice with leave to reinstate when bankruptcy stay has been lifted." This order was entered in the docket on May 17, 1984.

e.

On May 2, 1984, at the end of a pretrial conference with the district court, counsel for Steve Small reported to those present that Steve Small had been in an automobile accident in Texas and that his condition was unknown. Earlier in the same pretrial conference, the court had ordered Steve Small to appear in Chicago for his deposition "sometime before the trial" on May 15, 1984 (T 13; "T" references are to pages of the stenographic transcript).

On May 10, 1984, an "emergency" motion was made to the district court for Steve Small. The motion was to modify the order directing Steve Small to appear in Chicago for his deposition before trial on May 15, and for a continuance of the trial. The ground of the motion was that Steve Small was in a hospital in El Paso because of injuries in the auto accident. The motion for a continuance was denied. An oral motion (apparently by plaintiff) to sever Steve Small was granted. An order with this effect was dated May 10 and entered in the docket May 11, 1984.

At the opening of trial on May 15, in the robing room, counsel for all interested parties being present, there was further discussion of the situation as to Steve Small. Counsel for plaintiff agreed to accept a "voluntary nonsuit" as to Steve Small, the court retaining jurisdiction for six months to reinstate the claims against him (T 30).

A written order, dated May 15, 1984, was then signed by the district court and entered in the docket on May 17, 1984. This order among other things recited: "Defendant Steve Small dismissed without

prejudice, and court retains jurisdiction for 6 months."

f.

It remains to consider the dismissal after settlement of Frank and Anita Kimball, who were the last defendants to be dismissed before the trial against Angelica and Zvonkin commenced on May 15, 1984. The dismissal of the Kimballs and the commencement of the trial took place at the same time and the two proceedings were intertwined.

The background of the Kimballs is difficult to trace in this record; they have never testified. It would appear, however, that Frank Kimball founded and had the longest connection with the Kimberly gem selling operation, had the greatest knowledge of and experience in the gem business, and had the largest financial interest in the Kimberly operations.

Frank Kimball played a part in the critical error involved on this appeal—the admission into evidence (T 531) of Plaintiff Exhibits 66, 67, 68, and 69. These are four letters purporting to have been written by Frank Kimball, three to Angelica and Steve Small, and one to Kimball's attorney, at about the time Mayer was buying gems from Kimberly. They were admitted without any authentication whatever and counsel for Angelica were denied any opportunity to question Frank Kimball about them.

Frank Kimball founded and was the owner of all the capital stock of two California corporations, Kimberly Gems, Ltd. ("Kimberly Gems") and Kimberly International Gem Corp. ("Kimberly"). Anita Kimball is his wife. Apparently for reasons advantageous to Kimball, Kimberly Gems sold to Kimberly the gems which Kimberly in turn sold to the public. Kimberly seems to have acted as a selling agent for Kimberly Gems, which was the supplier and the principal.

On May 5, 1982, Frank Kimball sold all of the capital stock of Kimberly to Steve Angelica (appellant here) and Steve Small. The purchase price was $41,000, payable $5,000 at the closing, and $3,000 each month thereafter until the total of $41,000

had been paid. An important provision of the contract, executed May 5, 1982, was that for two years (subject to extension by either party to five years) from May 5, 1982, Kimberly Gems would sell to Kimberly all of the latter's requirements of gems "at the prices at which, for the immediately preceding six (6) month period from the date of the execution of this agreement, KIGC [Kimberly] has paid to KG [Kimberly Gems] for the stones purchased by KIGC...." A copy of the contract of sale was made part of a motion by the Kimballs, filed May 9, 1984, for a continuance of the trial. The contract does not explicitly provide that Kimberly must buy all its gem requirements from Kimberly Gems, but this is implicit from the contract itself. Indeed, the same motion of the Kimballs for a continuance discloses that all the gems sold to plaintiff were bought by Kimberly from Kimberly Gems, wholly owned by Frank Kimball (see para. 13 of the motion).

Thus, the sale by Frank Kimball of the stock of Kimberly changed nothing of substance. Kimberly Gems, wholly owned by Frank Kimball, continued to supply Kimberly with all its gems, including those sold to plaintiff, and at the same prices as had obtained when Kimball owned the stock of both corporations. Kimberly continued to function in substance as the sales agent of Kimberly Gems.

An affidavit of Frank Kimball, sworn to in Los Angeles on August 12, 1983 states: "I am not now, nor have I been since May 5, 1982, an officer, director, shareholder or employee of Kimberly International Gem Corp." This affidavit was filed September 9, 1983.

In their answer filed December 8, 1983, Frank and Anita Kimball pleaded as an affirmative defense: "As of May 5, 1982, the defendants terminated any and all association with Kimberly International Gem Corp." Since Kimberly Gems, wholly owned by Frank Kimball, supplied Kimberly with all the gems it sold, including those sold to plaintiff, this affirmative defense

seems disingenuous to say the least. While literally true, the affidavit is in substance meaningless because Kimball was the owner of Kimberly Gems, the supplier of all the gems sold by Kimberly.

On March 21 and 22, 1984, the plaintiff attempted to take the deposition of Frank Kimball in Los Angeles. At the outset, an attorney for Frank Kimball stated that he would assert his privilege against self-incrimination "based on the fact that as counsel for Mr. Kimball, we have been advised that there is an ongoing criminal investigation which concerns matters relating to Kimberly International Gem Corporation which I understand to be the same matters which are the subject of this civil action. We have been advised that Mr. Kimball at this time is regarded as a subject of that investigation" (Ex. 154, p. 3).

Despite the notice that Frank Kimball would not answer questions at his deposition, counsel for plaintiff propounded many questions to him, to all of which he asserted the privilege against self-incrimination. Among the questions asked and not answered (Ex. 154, pp. 32–34) were questions designed to authenticate what were then marked Exhibits 64, 74, 75, and 76—the four letters purporting to have been written by Frank Kimball—which as Exhibits 66, 67, 68, and 69 were erroneously admitted in evidence at the trial without any authentication (T 531). During a pretrial conference with the court on Wednesday, May 2, 1984, counsel for the Kimballs moved that the matter "be stayed pending completion of the criminal proceedings ongoing in California so that my clients ... will be able to appear and testify in this case without asserting their Fifth Amendment privilege" (T 13). The motion was summarily denied.

On "late" Friday, May 11, 1984, Chicago counsel for Frank and Anita Kimball caused to be delivered by hand to counsel for Angelica a letter advising that the Kimballs "intend to testify at the trial" and "will be available in Chicago on Monday, May 14, 1984, and thereafter for purposes of giving their deposition should you decide to depose them prior to their testimony at trial." The letter continued: "Please advise me as soon as possible if and when you would like to conduct these depositions" (T 558).

On the morning of Tuesday, May 15, the trial was called to commence before the district court. Present were (a) counsel for plaintiff Mayer (Homeyer and Pugh); (b) counsel for defendants Frank and Anita Kimball (Bollow and Talcott); (c) counsel for defendants Kimberly, Angelica, and Steve Small (Reed and Lucas); (d) counsel for Angelica (Nelson and Smith); and defendant Marsha Zvonkin, acting for herself.

In chambers, the trial judge first explained the jury selection procedure (T 17–18).

The "primary motion" (T 18) for plaintiff was then made; it was based on a settlement with the Kimballs, revealed for the first time, and was a "motion to dismiss them" (T 18). Without discussion, the trial judge granted the motion. Counsel for Angelica asked "to be informed of the terms of the settlement" (T 19). Counsel for Mayer protested that Mayer and the Kimballs "have agreed to keep it confidential." There was argument about the disclosure of the Kimballs' settlement terms. The court reserved its ruling on disclosure (T 23).

A motion for Angelica to continue the trial was denied (T 30).

A jury was then selected (T 33).

In the absence of the jury and after a luncheon recess, the court returned to the subject of a disclosure of the terms of the settlement between plaintiff and the Kimballs.

By then it had been learned that, while counsel for Angelica were in the Court House at the morning session of the trial and other proceedings, at "approximately 11:45 this morning" counsel for the Kimballs (Mr. Bollow, who was himself at the trial and other proceedings in the morning and could easily have handed a copy to counsel for Angelica) had caused to be

hand delivered to the *office* of counsel for Angelica a "Response to Requests for Admissions by Frank Kimball" (T 36). This procedure seems designed to cover up, or divert attention from, the fact that the "Response" of Frank Kimball was being served *after* Frank Kimball had been dismissed from the action. The fact seems nevertheless to be established by the record. According to the transcript, the proceedings at the Court House began at 10 a.m. The first page of the transcript for that day is 15; the motion to dismiss Frank Kimball was granted on page 18, which could not have been more than a few minutes after 10 a.m. The "Response" was not served at the *office* of counsel for Angelica until "approximately 11:45," or quite a bit after Frank Kimball had been dismissed from the action.

Soon after returning from the luncheon recess, counsel for Angelica reported to the court the fact that the "Response" had been served at his office (T 36). At about the same time, it was reported to the court by counsel for plaintiff that no copy of the settlement agreement with the Kimballs, the principal subject of the discussion before the lunch break, was available in court (T 36).

The trial judge asked to see the "Response" of Frank Kimball, and counsel for Angelica (Mr. Reed) handed it to him (T 37). Mr. Reed stated (T 37) that the document had been "handed to me by a messenger from my office this morning while jury selection was ongoing." The document, the "Response" (Ex. 158), bears a certificate of service executed by Chicago counsel for the Kimballs, which recites that he had caused a copy of the "foregoing Response" to be "hand delivered" to counsel for plaintiff and to counsel for Angelica at their Chicago offices "this 15th day of May, 1984, before 12:00 noon." In other words, the "Response," which could easily have been served on counsel for Angelica at the Court House on the morning of Tuesday, May 15, was instead served at the office of counsel for Angelica, who were thus kept in ignorance of the "Response" until *after*

the Kimballs had been dismissed from the action.

With the "Response" before him, the Court asked for a copy of the "Requests for Admissions" (T 37). Counsel for plaintiff stated that he had no copy, and it seems reasonably clear that there never was any "Request for Admission" as provided in Fed.R.Civ.P. 36(a). No such paper is noted in the docket sheet and nothing of the sort is contained in the record on appeal. It would appear that, in order to authenticate purported letters sent by Frank Kimball, a procedure was agreed upon by counsel for plaintiff and counsel for the Kimballs to combine a "Request" and a "Response" in one document which could be executed by Frank Kimball as part of the consideration for the settlement with him.

The original document "Response to Request for Admissions" carries a yellow sticker "Plaintiff's Exhibit 158," but it does not appear in the transcript that it was ever received in evidence. It purports to have been signed (not sworn to) by Frank Kimball on Saturday, May 12, 1984, in Los Angeles (a deduction from the fact that it is on stationery of a Los Angeles law firm). The document recites that Kimball "hereby responds to the Requests for Admissions propounded by the plaintiff *herein* . . . ." (emphasis supplied). The requests for admissions and the admissions are combined in one document. The requests ask that Kimball admit, among other things, that he "authored and signed Kimball Exhibits 69, 74, 75 and 76 attached hereto" and that he sent them by mail to Kimberly. Frank Kimball made the admissions requested.

The four Kimball Exhibits are on stationery of Kimberly Gems Ltd. All are signed "Frank." Exhibit 69 is dated July 10, 1982, and addressed to "Steves," Exhibit 74 is dated September 28, 1982, and addressed to "Steves," Exhibit 75 is dated October 3, 1982, and addressed to "Steves," and Exhibit 76 is dated October 3, 1982, and addressed to "Dave" (Kimball's lawyer).

It was then represented by counsel for plaintiff to the court that the purported

Kimball letters were "produced by the Kimballs in the course of discovery" and that they had been "produced some time ago" (T 38).

Counsel for Angelica then asked for a continuance of the trial so that he could take the deposition of Frank Kimball as to the letters sought to be authenticated by the "Response." The motion was denied without discussion (T 39).

Counsel for Angelica then moved that the "Response" be excluded "against any party remaining in this case" (T 40). The court ruled: "If the plaintiff in this case demonstrates that there is a conspiracy, it will be used in this case. Okay?" (T 40).

The trial judge then invited counsel for plaintiff and the court reporter, but not counsel for Angelica, to meet privately with him and "let's put on the record what the terms of the settlement between the Kimballs and the plaintiff provide" (T 40).

In camera, it was noted by counsel for plaintiff that they had no copy of the Settlement Agreement. It next appeared that Kimberly Gems, the corporation wholly owned by Frank Kimball, was a party to the settlement agreement even though not a defendant in the action.

The terms of the settlement as stated by counsel for plaintiff in camera, were as follows:

The primary terms are simply that we gave them a covenant not to sue; would dismiss them from this lawsuit; and in return they would pay our client a $35,-000.00 fee by personal check, which they did; and in addition, that they would answer our interrogatories—not our interrogatories, but our request for admissions, which they did; and thirdly, that neither party could sue each other and that it was settled for all time. Basically that is it.

Counsel for plaintiff also emphasized in camera that "there is another provision in the agreement that the terms will be kept confidential, unless ordered by [the] Court."

So far as appears, no information was given to counsel for Angelica as to the terms of settlement with the Kimballs.

After the in camera proceedings, counsel for Angelica moved in limine to "bar any use" of the Response (T 41), on the ground that Frank Kimball as a settling defendant and as part of the settlement agreement was "attempting to offer affirmative evidence for the benefit of the plaintiff against the remaining defendants" (T 42), and that it could not be an admission against interest when served after the Kimballs "have been dismissed and a settlement agreement has been reached with the plaintiff" (T 45).

On this motion the trial judge attached great significance to the fact that the admissions in the "Response" were not under oath (T 42). The trial judge understood that counsel for plaintiff intended to offer the "Response" in evidence and asked on what basis. The reply of counsel for plaintiff was that "they were a party to the lawsuit, that it was pursuant to discovery, the Court's order ..." (T 42–43). Counsel for plaintiff then added that the admissions in the "Response" were given "so that we would have no foundation problems" (T 43). The trial judge expressed the opinion as to the admissions: "They are exculpatory in nature, aren't they, rather than admissions" (T 44), to which counsel for plaintiff replied (T 45) that "the admissions only go to the foundation."

The motion in limine was then denied by the trial judge "provided the plaintiff can establish a conspiracy existed ..." (T 45). In so ruling, the trial judge overlooked that the four Kimball letters had never been properly authenticated, whatever might be their situation under other rules of "conspiracy" evidence.

The trial itself then began, the trial judge having ruled, that even without proof that Kimball wrote the four letters and mailed them and even without an opportunity to Angelica counsel to cross-examine Frank Kimball as to the circumstances under which those letters were written, they would be received in evidence "provided the

plaintiff can establish a conspiracy existed ..." (T 45).

### 5.

The opening statement for plaintiff made no claim that Angelica had anything to do with the purchases of gems by Mayer from Kimberly. The claim was that "Rene Small was the salesman who dealt with Mr. Mayer in these transactions. However, Mr. Mayer did not know him as Rene Small. He knew him as Rene Dupont" (T 60). Later, the jury was told in the opening for plaintiff (T 62):

As I said, it was Rene Small, who called himself Rene Dupont, when he spoke with Mr. Mayer, was a salesman at Kimberly International, who persuaded Mr. Mayer to purchase the stones that he did....

\* \* \* \* \* \*

Altogether Mr. Mayer spent $81,000 with Kimberly International. Mr. Dupont, Rene Small, sold all but one of these stones to Mr. Mayer. The other stone was sold to him by a co-president, Steve Small (T 62).

There was no claim that Angelica made any representations to Mayer.

The only references to Angelica in the opening were that he was co-president of Kimberly (T 60); that in May, 1982, Angelica and Steve Small purchased Kimberly (T 61); that Angelica used the names Alan Babs and Bill Burns to whom it was claimed Mayer spoke (T 66); that a company of Angelica took money out of Kimberly and that Angelica received a salary and commissions (T 68); and that Angelica was not in court and in his deposition had asserted his privilege against self-incrimination (T 68). Such was said to be the evidence against Angelica.

It was made clear in the opening that the breach of contract claim was "against the corporation alone, just against Kimberly International" (T 68).

There were references in the opening to the several different claims, but they were not distinguished by their numbers in the complaint.

The jury was told: "And on top of actual damages, we are asking for punitive damages" (T 68). While this followed a reference to the fraud claim, the jury was not told that punitive damages were asked *only* on the fraud claim and *not* on any of the other claims. The jury would have been justified in believing that punitive damages were being asked on each of the claims.

### 6.

Mr. Mayer testified extensively as to his purchases of gems from Kimberly, but in all his testimony he mentioned Angelica only once, reporting that after the action had been commenced he received a telephone call from Angelica (T 145). He did not say that he answered the telephone call or had any conversation with Angelica.

Mayer testified that during one telephone conversation, Dupont switched him to a Bill Burns of Kimberly with whom he discussed the return of a Blue Sapphire, that Burns said they wanted to satisfy him, that he could return the stone, and they would refund the price (T 128). Burns is a pseudonym of Angelica, and the conversation may in fact have been with Angelica. If so, it shows nothing actionable on the part of Angelica; he offered to do what would satisfy Mayer, but Mayer himself decided to use the Blue Sapphire as part payment to buy a golden sapphire (T 128-33).

Mayer also testified that at another point in a telephone conversation with Kimberly he was switched to Alan Babs; that he discussed with Babs selling his five sapphires through Kimberly for a "small brokerage fee"; that Babs offered to do this; and that the voice of Babs was the same as the voice of Burns (T 144-45). Babs is another pseudonym of Angelica, and if on this occasion Mayer did speak directly to Angelica, nothing said or done by Angelica evidenced any wrongdoing whatever.

Thus, the plaintiff gave no testimony which if believed would show any liability to him on the part of Angelica.

### 7.

Plaintiff Mayer called defendant Zvonkin as a witness.

By reason of ambiguities and typographical errors in the transcript, it is difficult to be certain for what period of time Zvonkin was employed by Kimberly. It is believed that the period was from November 11, 1982 to July 27, 1983 (T 270–71). From November 11, 1982 to February 7, 1983, she worked at Kimberly but was employed by "a temporary bookkeeper's agency" (T 270). From February 7, 1983 to July 27, 1983, she was employed by Kimberly with the title of "Controller" (T 270); she was discharged by Angelica (T 338). While she was employed by and at Kimberly, she used the name "Keane" in any dealings with customers because "Zvonkin is a difficult name for many people to spell and to pronounce ..." (T 342); she has used "Keane" at other times frequently, as for example, in restaurants; it was her grandfather's stage name (T 342). She had little to do with sales, had her own office, and dealt with financial books and records (T 364–65).

Zvonkin gave no testimony whatever as to any transactions by Angelica, either with Mayer or any other purchaser. She testified that Steve Small was basically in charge of sales and Angelica was in charge of administration (T 348); that they each had a company to which Kimberly paid "Management Consulting Fees" for "the services of Mr. Angelica and Mr. Small to Kimberly" (T 310); that there was "a small, small period where they were getting both salaries and the management fees, but it stopped, and they only got management fees" (T 310). During the direct examination for plaintiff of Zvonkin, there was this question and answer (T 283):

Q. Did Steve Angelica and Stephen Small train the salesmen?

A. Yes.

Nothing further was elicited on the subject and there was no indication that Zvonkin had any further knowledge.

Zvonkin testified that all gems sold by Kimberly were purchased from Kimberly Gems, which was owned by Frank Kimball, who came to the Kimberly offices at least twice a week (T 315); that Kimberly paid to Kimberly Gems for gems purchased in the year 1982 about $800,000 and for gems purchased in the first seven months of 1983 about $700,000 (T 317–19).

### 8.

Henry O. Terry, a gem appraiser, was called as a witness by plaintiff. He was named as a defendant but on February 13, 1984, made a settlement with Mayer by an executed settlement agreement (T 414). Under this settlement, Terry paid a sum of money, the amount of which was not revealed to counsel for Angelica, but appears to have been $7,500 (T 516). Terry also agreed to testify by deposition in Chicago for plaintiff and to testify for plaintiff at trial, all at his own expense (T 414). Terry was dismissed from the action after the settlement, as already noted.

Terry testified to one telephone conversation with Angelica. This was in May, 1983. Terry telephoned Kimberly to speak to Kimball, who was not there; he spoke to Angelica. Terry told Angelica that he (Terry) had received a copy of a certificate which Terry's company had issued in 1980 and for which Terry "had issued a recall letter [Ex. 136, November 14, 1980]" (T 407). Terry told Angelica that he "wished for him to please send the appraisals in and not use them" (T 407). Angelica said "he knew about the letter" (T 407). This was the only conversation Terry ever had with Angelica (T 409).

Casper J. Beesley was the only other witness called for plaintiff. Beesley is an appraiser of gems, who testified as to the values of the gems purchased by Mayer from Kimberly. He gave no evidence concerning any conduct of Angelica.

### 9.

The plaintiff called no further witnesses.

A number of documents were received in evidence for plaintiff over objections, some of which documents should be mentioned.

The deposition of Angelica was received in evidence as Ex. 153 (T 528). He made no answers at his deposition; to each question he asserted his self-incrimination privilege.

The two volumes of deposition of Frank Kimball were received in evidence as Exs. 154 and 155 (T 528). He also made no answers at his deposition, but asserted his self-incrimination privilege. It was represented to the court for Mayer that the Kimballs "are not available. They are no longer defendants. We have no power to compel them to come to court and testify" (T 524). In overruling an objection, the trial judge simply stated: "They are not available witnesses .... I am going to allow the Kimballs' deposition to go in" (T 525). The trial judge did not appear to focus on the real point involved. Frank Kimball did not give any *testimony* at his deposition, but asserted his self-incrimination privilege. The deposition was offered to justify an argument for plaintiff to the jury that an inference adverse to *Angelica* could be drawn because *Frank Kimball,* no longer a party, had earlier pleaded the Fifth Amendment.

An attempt was made by counsel for Mayer to admit in evidence as Exhibit 158 the "Response to Request for Admissions" signed by Frank Kimball on May 12, 1984, and described earlier herein (Section 5(f)). Counsel for Mayer moved its admission (T 528). Attached to the "Response" were the four Kimball letters which had been marked Kimball Exhibits 69, 74, 75 and 76 but which were now marked Plaintiff's Exhibits 66, 67, 68, and 69. The colloquy and the record became highly confused, but it appears that the four Kimball letters were detached from the "Response" (Ex. 158) and separately moved for admission by counsel for Mayer (T 529).

The upshot of the matter was that the four Kimball letters were received in evidence while the "Response" was not ruled upon and was never received in evidence. The relevant part of the transcript is as follows (T 531):

MS. HOMEYER: Your Honor, may I respond? Those four documents were identified in Mr. Kimball's deposition. If the Court wishes to admit them as statements of a co-conspirator through the deposition, that will be fine with us.

MR. NELSON: There is no foundation in the deposition for those documents. They were not identified. Mr. Kimball didn't testify in any way, shape or form regarding those letters as to any foundational matter. They are clearly hearsay. They lack foundation.

THE COURT: They may be admitted pursuant to the statements made during the conspiracy by a co-conspirator.

MR. NELSON: What statements is the Court referring to? I know of no statements made regarding those.

THE COURT: Statements contained within the documents.

MR. PUGH: Plaintiff's Exhibits 66 through 69. (Plaintiff's Exhibits 66 through 69 for identification received in evidence.)

This result, in our view, was error. Four letters of Kimball, seriously prejudicial to Angelica, were received in evidence against Angelica without any foundation or authentication and without counsel for Angelica being allowed to cross-examine Kimball about them. The representation to the court that the four letters "were identified in Mr. Kimball's deposition" was mistaken, as an inspection of the deposition (Ex. 154, pp. 32–34) will quickly show. While the "Response" does identify the four Kimball letters, it was never filed until an inquiry by this court after the argument led to its filing on October 11, 1985; it was in violation of the "Admissions" procedure in Fed. R.Civ.P. 36; and it was the result of an arrangement as part of the settlement between plaintiff Mayer and Kimball to provide foundation for the Kimball letters *after* Kimball by settlement had ceased to be a party to the action and wished to avoid cross-examination about them.

It would appear from the transcript that the trial judge admitted the four Kimball letters as authenticated by the statements of a "co-conspirator" contained in the letters themselves. We believe that such rea-

soning is erroneous. In this connection, it may be noted that the claim of conspiracy is only one of four separate claims submitted to the jury.

The plaintiff then rested (T 535).

### 10.

It then appeared (T 536–37) that plaintiff did not wish to proceed on Count IV, the breach of contract claim, against the two defendants represented at the trial, Angelica and Zvonkin. Counsel for plaintiff stated that the breach of contract claim was directed "only against the corporation [Kimberly]" (T 536). Count IV of the complaint informally was dropped and Count V (a claim under an Illinois Act) was renumbered Count IV for submission to the jury.

Defendant Angelica then moved for a directed verdict (T 539). The trial judge, after hearing argument, denied the motion (T 539).

The only evidence presented for Angelica was testimony of Mayer called as a witness for Angelica, which is not relevant for this appeal, and several documents, also not relevant for this appeal (T 539–52).

The plaintiff presented no rebuttal evidence.

### 11.

The court discussed with counsel at some length the instructions requested by the parties. Very little of this discussion is relevant on this appeal.

The verdict forms as finally submitted to the jury were those proposed by the plaintiff Mayer (T 660). Angelica asked that special interrogatories be submitted. In the confused mass of papers in this record, it is difficult to identify these, but they appear to be part of a large group of papers described in the docket as No. 185, "Jury instructions refused, withdrawn," filed May 22, 1984. The trial judge rejected the verdict forms and special interrogatories proposed by Angelica, and accepted those proposed by plaintiff (T 668).

From the discussion between court and counsel, it is clear that *all* were agreed that punitive damages could be awarded by the jury *only* on Count III, the common

law fraud count, and could *not* be awarded on the other three counts. The transcript is clear (T 663):

THE COURT: The only one with punitive is Count III.

MR. PUGH [counsel for plaintiff]: Yes, Your Honor.

THE COURT: Right?

MR. PUGH: Yes, Your Honor.

It is also clear from the record that all agreed that, as to Count III, there could be a finding of *punitive* damages *only* if there were a finding of *actual* damage (T 663).

### 12.

The closing arguments for plaintiff did little to make matters clear to the jury.

There was little evidence against Angelica which could be argued to the jury. As the argument went, he was co-president of Kimberly, he was employed by Kimberly, he had a company which was "taking money out" of Kimberly for management services, he trained salesmen, and he used the names Babs and Burns (T 706–13). The principal part of the argument for plaintiff was reading at length from the deposition of Angelica (T 714–18) to show the assertion of the self-incrimination privilege, and to urge an inference adverse to Angelica (T 718). There was equally strong reliance on the four Kimball letters (Exs. 66–69) and the claim that Frank and Anita Kimball are "the people who are running" Kimberly (T 756). Excerpts from the Kimball letters were read to show that the prices charged were "ludicrous" (T 719) and from a letter from Kimball to his attorney to show that Angelica and Steve Small "want to break into jail" (T 719).

It was argued to the jury that the actual damages to Mayer were $103,000. This was said to be made up of $81,000 (rounded off) paid Kimberly for the gems and $25,000 for "lost profits and interest," less $3,000 for liquidation value of the gems, or a total of $103,000 in actual damages (T 759).

The argument for punitive damages was addressed in general to the plaintiff's case taken as a whole, without any reference to the fact that there were four separate claims, that on only one claim were punitive damages being asked, and that on only one claim could punitive damages be awarded (T 759–61). The argument for punitive damages was summarized in this way (T 761): "I ask you then ... I think ten times his damages will send a signal. I am talking about more than a million dollars for my client."

### 13.

The instructions to the jury as to the substantive law governing the four separate claims appear to have omitted any instructions for Count II, the so-called "Rico Conspiracy," based on 18 U.S.C. § 1962(d). The parties have not mentioned the matter in their briefs, and we can only assume that the transcript supplied is accurate. The record does not contain any of the requested charges, except those refused or withdrawn.

The jury was never instructed that there were four separate claims, to be separately considered.

The jury was instructed (T 711–76) as to the claim for an alleged violation of 18 U.S.C. § 1962(c), the "Rico Violation" count, although this section of the Rico statute was not read. The claim was several times referred to as "the first cause of action."

The instructions, as reflected in the transcript at page 776, seem to jump from the "first cause of action" to "the fraud claim in count 3 of the complaint" without any mention of the separate Count II of the complaint, the so-called "Rico Conspiracy" claim, based on 18 U.S.C. § 1962(d). There are two paragraphs in between, but these tell the jury merely that the plaintiff need not sue all persons who may have participated with the "defendant in the alleged conspiracy," without explaining to what conspiracy the court is referring; in fact, the court does not appear up to that point to have referred to *any* conspiracy nor even to have used the word "conspiracy."

As earlier noted, Count II in the complaint appears to have been submitted to the jury with no instructions from the court. The law on which Count II was based, 18 U.S.C. § 1962(d), was not read nor explained to the jury nor mentioned. The essential elements of the claim were not explained; what constitutes a conspiracy was not explained nor defined. The difference between a substantive offense and a conspiracy to commit that offense was not explained.

After instructing the jury as to Count III, the common law fraud claim, the court passed (T 777) to the "elements of an action under the Consumer Fraud and Deceptive Business Practices Act," without any indication that this was a different and separate claim under an Illinois statute and that it was Count IV of the complaint (as informally renumbered).

The court had not at any time told the jury that there were four separate and distinct claims being submitted, and that each claim should be separately considered. When the court then gave instructions as to actual and punitive damages, such instructions were given generally in respect of all four claims without any distinction among the claims. We do not approve such generalized instructions as to punitive damages, instructions which were bound to produce confusion in the minds of the jurors and a confused verdict. The jury was not told that punitive damages were asked only on Count III (the fraud Count), that punitive damages were not asked on Counts I, II and IV, that if either defendant or both defendants were found liable on Counts I, II, or IV, the jury should consider only *actual* damages as to that Count or those Counts, and that if either defendant or both defendants were found liable on Count III, the jury should consider both actual and punitive damages as to that one Count.

Clear instructions on each separate count as to an award of actual damages only or an award of actual and punitive damages were especially important in this action, because unless *actual* damages are award-

ed on a claim, punitive damages cannot be awarded *on that claim.* There appeared to be no dispute about this in the record and the court charged on this point as follows (T 782):

> If the jury should find in accordance with all the other instructions and the evidence in the case that the plaintiff is entitled to a verdict for actual or compensatory damages and should further find that the acts or omissions of the defendants which proximately caused the actual injury or damage to the plaintiff were maliciously, or wantonly, or oppressively done, then the jury may find in the exercise of its discretion if they unanimously choose so to do, add to the award of damages such amount as the jury shall unanimously agree would be proper as punitive and exemplary damages.

The difficulty, of course, is that this instruction was given in general terms and as to the four counts as a whole. While in principle correct, as to this case it was confusing: it did not tell the jury that punitive damages could in any event be awarded only on Count III because punitive damages were asked *only* on that one count and because the award of actual damages on one count permits the award of punitive damages on that one count *only* and not on any other count.

The confusion was compounded by the forms then given to the jury for its verdict, and the explanation of the forms by the court.

The forms for a verdict against Angelica on the four counts read as follows:

> We, the jury, find in favor of plaintiff ... against the defendant Steve Angelica on Count I of the Complaint (RICO) and award damages in the amount of _____.

> We, the jury, find in favor of plaintiff ... against the defendant Steve Angelica on Count II of the complaint (Rico conspiracy) and award damages in the amount of _____.

> We, the jury, find in favor of plaintiff ... against the defendant Steve Angelica on Count III of the complaint (fraud) and award actual damages in the amount of _____ and punitive damages in the amount of _____.

> We, the jury, find in favor of plaintiff ... and against the defendant Steve Angelica, on Count IV of the Complaint (Illinois Consumer Fraud and Deceptive Business Practices Act) and award damages in the amount of _____.

The forms, *which were prepared and proposed by counsel for plaintiff* (T 660–61), contain a very serious error which in conjunction with other errors, led to the return of an ambiguous verdict. The forms for liability on Counts I, II and IV, use the expression "award damages in the amount of _____" instead of "award actual damages," etc., thus blurring the distinction between actual and punitive damages. Only the form for Count III—the only count on which punitive damages were asked and could be awarded—made the correct distinction between "actual damages" and "punitive damages." Counsel for plaintiff had earlier so explained to the court (T 661) but *out of the presence of the jury:* "... the difference being the common law fraud count would also have the punitive damages claim".

The court explained to the jury that they were being given 16 verdict forms, of which they were to sign 8 (T 784).

The court took as an example "the Rico count which is Count I", pointed out the form to use if the jury found "against Steve Angelica", read that form, and added (T 785):

> And there you will see a blank space, and the jury foreman will include in that blank space, if this is your verdict the amount of damages so found under that count.

The court was mistaken in referring to "the Rico Count" instead of "the Rico Violation count," as Count I was called in the complaint. The verdict form for Count I was itself mistaken in referring to "Count I of the Complaint (Rico)" as if there were only one "Rico Count." The court was further mistaken in explaining that the jury "will include in that blank space ...

the amount of damages" instead of "the amount of *actual* damages," to make clear that only actual damages could be awarded on Count I.

The court explained that "there are four verdict forms with reference to Count 2 which is the conspiracy Count" and also that "there are two verdict forms for Mr. Mayer's case against Marsha Zvonkin on the conspiracy Count" (T 786). The court was mistaken in calling Count II "the conspiracy Count"; it was "the Rico conspiracy" count, based on 18 U.S.C. § 1962(d), a part of the Rico Act making it unlawful for any person "to conspire to violate" 18 U.S.C. § 1962(a), (b), or (c). This mistake added to the failure to give any jury instructions on Count II. The Court pointed out a difference in the verdict forms for Count III. The court said (T 786):

> On Count 3, which is the fraud count, you will see something a little different in the verdict form. You will see two blank spaces in the verdict forms that find for the plaintiff. The reason for that, as you may recall from reading the instructions, in this count, the plaintiff is seeking punitive damages. And as I indicated before, before you can find punitive damages, if you so find, you must find that the plaintiff has sustained some actual damages, because if you find no actual damages, you cannot award punitive damages.

The instructions would have been entirely clear had Count III been the only count. But where, as here, there were three other counts, the instruction was confusing because it failed to point out that a finding of actual damages on Count III would permit a finding of punitive damages on Count III only, and that no punitive damages could in any event be awarded on Counts I, II, and IV.

We have already referred to the error in the court's instructions in failing to give any instructions as to Count II. But the failure to distinguish between actual and punitive damages as to counts I, II, and IV and the failure to advise the jury that *no* punitive damages could be awarded on those counts, left the jury with the confused impression that if *any* actual damages were awarded on any count, punitive damages could be awarded on any count against either or both defendants Angelica and Zvonkin.

### 14.

After the court charged the jury, deliberations began at 2:45 p.m. on Monday, May 21, 1984 (T 789). At 4:40 p.m., the jury was brought back and asked by the court if it was "close to a verdict"; the answer of the foreman was "we are not" (T 791). The jury continued its deliberations under a stipulation that if a verdict were not reached by 7 p.m. on May 21, the jury would "separate and return to their homes" and return to the jury room at 9 a.m. on May 22 "to continue their deliberations" (T 792).

The court opened at 10:10 a.m. on May 22. The trial judge reported a "very odd situation," that, at 5:50 p.m. of the evening before, the jury had given to the Marshal a note reporting that they were missing "the descriptions of violations" of "chapter 121½ of paragraph 2620 [should be "262"] of the Illinois Statutes, that it wanted clarifications, and that after "this note was prepared," the jury had "indicated" to the Marshal that "they had reached a verdict" (T 797). Agreed copies of the Illinois Statutes were given to the Marshal for the jury.

At 11:10 a.m., the jury returned to the Court Room, Foreman Balmes stated that the jury had reached a verdict, and verdict forms were handed up to the Court (T 801). The jury then retired (T 801).

The court then discussed with counsel the verdict as returned, indicating bafflement and perplexity at the meaning of the verdict. The court first said (T 801): "What I predicted would happen has happened. There are different amounts on the verdicts."

The verdict forms showed that the jury signed four forms that Angelica was liable on all four counts submitted and that damages were awarded in the blank spaces as follows:

on Count I: "award damages in the amount of 100,000.00."

on Count II: "award damages in the amount of 100,000.00."

on Count III: "award actual damages in the amount of 103,000.00 and punitive damages in the amount of 250,000.00. (250,000.00)"

on Count IV: "award damages in the amount of 50,000.00."

The verdict forms showed that the jury signed two forms that Zvonkin was liable on Counts II and IV and that damages were awarded in the blank spaces as follows:

on Count II: "award damages in the amount of 5,000.00."

on Count IV: "award damages in the amount of 500.00."

It can be seen at once, and without questioning the jury, that the "actual damages" which could be awarded on any count as to either defendant were the $103,000, the figure shown as to Angelica on Count III. This follows because, right or wrong, the plaintiff had calculated his actual damages as $103,000 and had used this figure in his argument to the jury, which apparently the jury accepted. The actual damages would not vary from count to count or from defendant to defendant. Therefore, to return against Zvonkin a verdict for $5,000 on Count II and $500 on Count IV meant on its face that the amounts were punitive damages, which the instructions stated were within the discretion of the jury, but "before you can find punitive damages ... you must find that the plaintiff has sustained some actual damages" (T 786; giving the impression, if actual damages had been awarded on any count against any defendant).

After reporting the several verdicts to counsel, the court stated (T 802; emphasis supplied):

THE COURT: Now, I don't know whether this jury was thinking of returning a verdict in the amount of $353,000 on *actual* damages. *That can't possibl[y] be.*

MR. PUGH: Which one are you referring to?

THE COURT: What I am referring to is the $100,000 on Count One, $100,000 on Count Two, $103,000 actual damages on Count Three, and $50,000 actual damages on Count Four [an error; the verdict form read simply "damages"]. *I don't understand the verdict at all.*

After further talk, the court then stated (T 802–03; emphasis supplied):

THE COURT: Let's assume that we take the $103,000 actual damages on the fraud count and enter judgment on that amount. That would be the total amount of actual damages you would seek to recover in this case, is that correct?

MR. PUGH [counsel for plaintiff]: Yes, your Honor.

THE COURT: Okay. In light of Mr. Pugh's agreeing that the extent of the recovery of the plaintiff against Angelica would be no more than $103,000, would you want this court to ask the jury what they intended with this verdict? Did they intend it to be punitive or what?

MR. NELSON: What is the court's interpretation of the $250,000?

THE COURT: The two fifty? *I don't know what that means.* There is $250,-000, a blank space, and then in parentheses next to it there is another 250,000 without the dollar sign. *I don't know what they mean by that.*

MR. PUGH: I think we will have to ask them with regard to that. Or your Honor can instruct them and give them another instruction. Now, I don't know if you can give them another instruction.

MR. LUCAS: I don't think they can be instructed.

THE COURT: I think their intent is pretty clear. *How they can find actual damages in differing amounts escapes me.*

MR. NELSON: This might be a mistrial, your Honor.

THE COURT: No, it is not a mistrial.

MR. PUGH: This is a denial of that motion?

Mr. Nelson: You can take that as a motion then.

Mr. Pugh: Your Honor, it is our position that they are talking about 103, plus 250, plus 200—

Mr. Nelson: I don't think that is any reasonable explanation of the punitive damages. Punitive damages on that form is 250.

The Court: I am going to bite the bullet on this one. I am going to ask the foreperson what he means by this verdict and get their expression.

The court then asked that the jury be brought in. Before resuming the narrative, it should be emphasized that from the verdict forms given to the jury, neither court nor counsel could determine what amounts were awarded on Counts I, II, and IV for actual damages and what amounts were awarded for punitive damages, since only the one word "damages" was used on the form for those counts instead of "actual damages." The verdict was confusing, ambiguous and inconsistent—as was bound to be the case because the verdict forms were confusing. This deserves emphasis because after then returning to the Court Room, the jury was given no further instructions, was not asked to deliberate further, did not deliberate further, and did not in any way change its verdict as recorded on the verdict forms.

When the jury returned, the following took place in open court (T 804–05; emphasis supplied):

The Court: Good morning, ladies and gentlemen. Please be seated.

The court sees that the jury has entered a verdict on Count One against Mr. Angelica in favor of the plaintiff in the amount of $100,000 in *actual* damages, is that correct?

Foreman Balmes: Those were *punitive* damages.

The Court: Well, I am looking at the very first verdict, the RICO Count. It says:

"... award damages in the amount of $100,000."

Juror Julius Eugene Scurry: That was *actual* damages.

Since the verdict forms for Counts I, II, and IV used only the word "damages" and since the Court had *not* instructed the jury that no punitive damages could be awarded on Count I, we believe it an error for the Court to state that the $100,000 awarded on that count was "actual damages." The foreman stated that the award on Count I was "punitive damages." A juror spoke up and (as it turned out, mistakenly) said that the award on Count I was "actual damages." We believe that the trial court should have then instructed the jury that no punitive damages could be awarded on Count I and that they should deliberate further on Count I and decide whether to award *actual* damages on that count, and if so, in what amount.

Despite the ambiguity in the verdict as returned, it was treated as of no significance whether the "damages" awarded on Counts I, II, and IV were actual or punitive. After the last question and answer quoted above, the trial judge continued his inquiries of the jurors and continued to overlook the distinction for Counts I, II, and IV between actual damages and punitive damages (T 805–06):

The Court: Is that correct? All of you agree that you wanted to enter a verdict in the amount of $100,000 on the RICO count? Is that correct?

Jurors: Yes.

The Court: I see you all nodding "yes".

On Count Two which is the conspiracy count the jury has returned a verdict in the amount of $100,000. Is that correct?

Jurors: Yes.

The Court: On Count Three, the fraud count, the jury returned a verdict in the amount of $103,000 for actual damages and then for punitive damages there's a figure of $250,000. Is that correct?

Foreman Balmes: Right.

The Court: And then another figure in parentheses $250,000.

FOREMAN BALMES: I did that because I wasn't sure the first number I wrote was clear. I should have crossed that out.

THE COURT: Okay. Fine. Do you agree that you all unanimously agreed that on Count Three, the fraud count, your verdict was in the amount of $103,-000 for actual damages and $250,000 for punitive damages. Is that correct? I see you all nodding "yes."

And, finally, as against Mr. Angelica, the jury found in favor of plaintiff and against Mr. Angelica and awarded damages in the amount of $50,000. Is that correct?

FOREMAN BALMES: Yes.

JUROR SCURRY: Yes.

At this point there had been no clarification on the record whether the jury intended the "damages" awarded on Counts I, II, and IV as actual or punitive, bearing in mind that the jury had not been instructed that *no* punitive damages could be awarded on those counts.

From all that had been told to the jury, it seems very likely to us that the jurors reasonably believed that if they awarded *actual* damages on *any* count against either defendant they could then award *punitive* damages in their discretion against either or both defendants on any or *all* counts. The lawyers on both sides and the trial judge knew that this was not true. The instructions to the jury, however, did not make this plain; they reasonably could be understood as the jurors appear to have understood them.

The trial judge and the lawyers had intended "damages" as used in the verdict forms to mean "actual damages." Therefore, the court continued his inquiries of the jurors to find out whether they meant "damages" in Counts I, II, and IV to be actual or punitive (T 806–07):

THE COURT: Did the jury mean to add up all of these figures to come to a total of $353,000 for actual damages when you add up all the four counts and $250,000 for punitive damages?

MR. SCURRY: No, no.

THE COURT: Does the jury mean that Mr. Angelica was to pay $50,000 for damages in this case?

MR. SCURRY: No.

THE COURT: Mr. Balmes.

FOREMAN BALMES: No, the only actual damages against Mr. Angelica were $103,000. The balance was in punitive.

THE COURT: Why did you write $100,-000 in Count One and $50,000 in Count Four?

FOREMAN BALMES: We started with punitive damages of $500,000, and we split that among each charge based on the gravity that we determined. We felt the fraud charge was the largest charge.

THE COURT: Do I understand you correctly then what you intended to do was to have Mr. Mayer recover $103,000 in actual damages as the maximum amount and $250,000 in punitive damages. Was that the intent of the jury?

FOREMAN BALMES: From Mr. Angelica?

THE COURT: Yes.

FOREMAN BALMES: There should be five hundred thousand. What our intent was $500,000 in punitive and $103,000 in actual.

THE COURT: Would you repeat that? You intended, the jury intended to have the plaintiff recover how much in actual damages?

FOREMAN BALMES: One hundred three thousand dollars.

THE COURT: And how much in punitive damages?

FOREMAN BALMES: Five hundred thousand.

THE COURT: So you intended that he recover a total of $603,000 from Mr. Angelica?

FOREMAN BALMES: That's correct.

THE COURT: These figures would add up to $603,000, is that what you are saying?

FOREMAN BALMES: They should unless they are written improperly.

THE COURT: And it does.

At that point, it appears to have been established that the verdict of the jury as to

Angelica shown on the verdict forms, according to the answers of the jury, was intended to be as follows:

on Count I: no actual damages; $100,000 punitive damages

on Count II: no actual damages; $100,000 punitive damages

on Count III: $103,000 actual damages; $250,000 punitive damages

on Count IV: no actual damages; $50,000 punitive damages.

It seems thus to have been clear that the jury had not correctly understood their instructions, however excusable this may have been. Punitive damages had *not* been asked on Counts I, II, and IV and for this—and other good reasons—could not be awarded on those counts.

We believe that the best course at this point would have been to declare a mistrial. We believe it would have been an optional course to return the jury to deliberate further under additional, plain, and proper instructions. But neither course was followed: In effect, an improper verdict was accepted.

The trial judge then passed to the verdict forms returned as to Zvonkin. He noted that the jury had returned a verdict in favor of Zvonkin on Counts I and III and against "Ms. Zvonkin in the amount of $5,000 on the Rico conspiracy count" and "against Ms. Zvonkin in the amount of $500 on the Illinois Consumer Fraud and Deceptive Business Practices" (T 807–08).

He then asked the jury (T 808):

Did you mean to have Mr. Mayer recover $5,500 from Ms. Zvonkin? Is that correct?

FOREMAN BALMES: Yes, it is.

THE COURT: Do you all agree?

JURORS: Yes.

THE COURT: And that $5,500, did you mean that to be in addition to the $603,000 that Mr. Mayer recovered from Mr. Angelica?

FOREMAN BALMES: Yes, we did.

THE COURT: You all agree?

JURORS: Yes.

It will be seen that the court's inquiries of the jury on the Count II and Count IV verdicts against Zvonkin did not clarify the ambiguity whether the amounts written on the verdict forms as "damages" were actual damages or punitive damages. The question was not asked: Are the amounts on the verdict forms actual damages or punitive damages against Zvonkin?

Based on the answers given as to the Angelica verdict forms, it is virtually certain that the "damages" awarded against Zvonkin were punitive damages only.

The court then asked if the jury should be polled. Counsel for Angelica so requested. The clerk then took a poll of the jury, but not in an informative fashion. What the verdict was on each count and as to each defendant was not summarized by the clerk. Instead, after the period of questions, responses, and colloquy before the poll, the clerk simply asked each juror whether "this" is *"now* your verdict" (emphasis supplied). To what "this" referred was never explained. The jurors had no way of knowing how their verdict was being recorded as between actual and punitive damages on each count and as to each defendant and whether the verdict being recorded differed from the verdict forms returned, and, if so, how. The "now" in the question appears to carry an implication that the verdict is "now" different in some way from what it was on the verdict forms. This, of course, was not in fact the case. After the return of the verdict forms and after the inquiries and colloquy, the jury had never further deliberated and no change was made in the verdict forms. They remained exactly as they had been returned.

In any event, each juror answered "Yes" to the poll question.

The court then excused the jury (T 809–10).

### 15.

The court then directed entry of judgments on the verdicts.

The court first directed entry of judgment against those defendants already de-

termined to be in default. The court stated (T 810–11):

> THE COURT: There will be a judgment against Rene Small, a/k/a Rene DuPont in the amount of $103,000 by way of actual damages and $500,000 by way of punitive damages on the fraud count. That would be Count Three. Judgment will be entered on the verdict.
>
> MR. PUGH: Robert McCallum and we also have International Gemological Society, the other two remaining defendants.
>
> THE COURT: There will be judgment entered in the same amounts, $103,000 actual and $500,000 punitive damages here, again, on Count Three.
>
> MR. PUGH: Against both of those defendants.
>
> THE COURT: Yes.
>
> MR. PUGH: Also under the Rico, there is the automatic trebling of the damages awarded. We would ask you to enter that as part of your judgment and give us leave [to] file a petition for attorneys' fees within twenty-one days.
>
> THE COURT: The Court will treble the damages on the actual damages, the Rico count, to $309,000. And give you leave to file a petition for attorneys' fees.

Thus, after having directed entry of judgment against the defaulting defendants for $103,000 actual damages and $500,000 punitive damages on Count III, the fraud count, the court trebled "the damages on the actual damages" to $309,000 against the defaulting defendants, not on Count III, the fraud count, but apparently on Count I, the "Rico count" (according to the complaint, the "Rico violation" count).

On the same day (May 22) a written order was made, dated May 22, in terms entering judgment against the defaulting defendants "in the amount of $103,000 actual damages, trebled to $309,000 plus punitive damages in the amount of $500,000". This order was entered May 23, 1984. There is nothing in the order to indicate on what count the order is based. The trebling of actual damages is authorized by law only on Counts I and II which were under the Rico statute.

After some inquiry whether there were any other defaults, and being satisfied that there were none, the court inquired (T 811): "That disposes of the entire case, does it?" Counsel for Mayer answered (T 811):

> MR. PUGH: Except with regard to Mr. Angelica and Ms. Zvonkin, the trebling of the actual damages on the count and our petition for attorneys' fees.

Counsel for defendant Angelica asked to be heard (T 811): "I would like to speak to that when you are through". The trial judge required, however, that the objections of Angelica be presented in post-trial motions (T 812; emphasis supplied):

> THE COURT: I will treble the damages as to Mr. Angelica on the Rico Count and give you leave to file attorneys' fees. All of this stuff will come in by way of post-trial motions.

Counsel for defendant Angelica then inquired (T 812):

> MR. NELSON: You don't want to hear from me on this subject, then?

The court replied (T 812):

> THE COURT: No, right now, I am entering judgments on the verdicts and trebling on the Rico counts. I want to clean up all the loose ends in the case.
>
> Does that now take care of all the defendants?
>
> MR. PUGH: No, Ms. Zvonkin.
>
> THE COURT: All right, Ms. Zvonkin. Treble the damages to $15,000 and give you leave to file a petition for attorneys' fees in connection with that....

Doubtless having in mind the earlier attempt of counsel for Angelica to press objections and his own expressed preference that these be done by post-trial motions, the trial judge addressed an inquiry to counsel for Angelica, and the following colloquy took place (T 812–13):

> THE COURT: Do the defendants wish to file post-trial motions?
>
> MR. NELSON [counsel for Angelica]: Yes, we will be filing post-trial motions, your Honor, and just so the record is clear, we are not waiving any of our rights here. We do think these are in-

consistent verdicts. We will be filing motions. I renew my motion that I made for a mistrial. It is based on the jury's inconsistent verdicts. That will be taken care of—

THE COURT: They appeared to be inconsistent to me until I heard the jury's explanation. Apparently, Mr. Pugh guessed what the jury had done.

How long would you need to file your post-trial motions?

MR. NELSON: Twenty-one days.

THE COURT: Twenty-one days. Okay.

A schedule was then fixed for all post-trial motions and the trial proceedings effectively terminated.

On the same day, a written order was made by the court, dated May 22 and entered in the docket May 23, 1984, confirming the schedule of post-trial motions. Among other things, this order provided: "Defendants to file post trial motions by June 12, 1984." No objection whatever was voiced by counsel for appellee Mayer to this schedule, giving Angelica until June 12, 1984 "to file post trial motions." The written order fixing the schedule for post-trial motions did not contemplate oral argument; the order ended: "Court will rule by mail."

On the same day, the district court made a written order dated May 22, 1984, and entered in the docket on May 23, 1984, which as to Angelica was as follows:

Jury returns verdict in favor of plaintiff and against defendant, STEVE ANGELICA on all counts and awards actual damages of $103,000 and total punitive damages of $500,000. Court trebles the actual damages and enters judgment in the total amount of $809,000.... Trial ends.

### 16.

On June 12, 1984, two post-trial motions were filed for Angelica in the district court.

One of these was a motion for a new trial under Fed.R.Civ.P. 59 and, as recited in the motion, "pursuant to the May 22, 1984, order" of the district judge. This motion contended, among other things that "the

jury verdicts were inconsistent and uncertain" and that the trial court erroneously "admitted into evidence Exhibit[s] 66–69, inclusive, which purport to be letters prepared by Frank Kimball" and which "contain information which is highly prejudicial to Mr. Angelica's defense."

The second motion was for judgment notwithstanding the verdict under Fed.R. Civ.P. 50 and, as recited in the motion, "pursuant to the May 22, 1984 order" of the district judge.

Certificates were filed that copies of the two motions were personally served on counsel for appellee Mayer on June 12, 1984.

On June 26, 1984, counsel for appellee Mayer filed a memorandum "in response to" Angelica's motion for a new trial. There was no contention for Mayer that the motion was not timely.

On July 19, 1984, counsel for appellee Mayer filed a memorandum "in response to" Angelica's motion for judgment notwithstanding the verdict. There was no contention for Mayer that the motion was not timely.

By order dated August 2, 1984, and docketed August 6, 1984, the court denied without opinion the two post-trial motions for Angelica. By the same order, with memorandum opinion, the court granted a motion of plaintiff Mayer for attorney's fees and costs against Angelica, awarding $86,752.50 against him for attorney's fees and $6,001.47 in costs.

### 17.

On June 19, 1984, Angelica had filed a notice of appeal to this court from "the judgment entered in this action on the 22nd day of May, 1984." This is undoubtedly a reference to the order of the trial judge dated May 22, 1984, entered in the docket May 23, 1984, directing judgment for $809,000 against Angelica. The appeal from this order is No. 84–2053 in this court.

On August 13, 1984, Angelica filed a notice of appeal to this court from the May 22, 1984, "judgment" and "from the District Court's order of August 2, 1984" de-

nying the two post-trial motions of Angelica. This appeal is No. 84–2388 in this court.

### 18.

We have indicated, in our statement of the history of this litigation, our disapproval of the procedures followed in the district court on the return of the jury verdict. We need not decide whether these mistaken procedures would themselves require reversal of the "judgment" or "order" from which these two appeals are taken. This is because, as will shortly be explained, the admission in evidence of the four letters purportedly written by Frank Kimball—Exhibits 66, 67, 68, and 69—is so serious and prejudicial an error as to require remand for a new trial. We rest our decision to reverse on this basis and, therefore, need not decide the many issues presented by the treatment of the jury verdicts.

These many issues are troubling.

The jury awarded *only* punitive damages against Angelica on Counts I, II, and IV when *no* punitive damages had ever been asked—in the complaint or otherwise—on these counts.

The jury awarded no actual damages on Count I, the "Rico Violation" count, but the trial judge trebled the award nonetheless, when there was nothing to treble under the applicable statute (18 U.S.C. § 1964(c)).

The awards of punitive damages on Counts I, II, and IV could in no event be justified because, no *actual* damages having been awarded on those counts, an award of punitive damages was contrary to law, as the trial court had instructed the jury (T 772, 777).

We note that appellee Mayer argues (Brief, p. 12) that these issues may not be raised by Angelica on appeal because of his "failure to file a motion for a new trial."

This argument, of course, is contrary to the fact. Angelica did file a motion for a new trial.

Elsewhere, Mayer apparently argues (Brief, pp. 12, 13, 14, 25) that Angelica did not file a *"timely* post trial motion" (emphasis supplied). Apparently this is in reliance on Fed.R.Civ.P. 6(b) that the court may not extend the times for filing motions under Fed.R.Civ.P. 50(b) and 59(b).

We need not address these highly technical objections, never advanced below, to the *timeliness* of the post-trial motions made for Angelica and decided on the merits by the district court. There is a real question whether any "judgment" was ever entered on the jury verdict because no judgment was ever "set forth on a separate document" (Fed.R.Civ.P. 58). *See Home Federal etc. v. Republic Insurance Co.,* 405 F.2d 18, 25 (7th Cir.1968). The time for filing post-trial motions may thus have never begun to run. There is a question, of course, whether in any event there are not "unique circumstances" which permitted the district court to consider on the merits as timely the post-trial motions filed by Angelica in reliance on the extension of time therefor granted after foreclosing any objection except by such motions. *Eady v. Foerder,* 381 F.2d 980 (7th Cir.1967).

We see no reason to decide whether the procedures followed by the district court after the return by the jury of its verdict would, standing alone, require reversal of the result below. It is clear that there must be a new trial because of the erroneous admission of prejudicial evidence, next to be discussed. We do not anticipate that, in light of the experience at the trial below and the expression of our views as to the procedures followed after the verdict, there will be any repetition of these matters at a new trial.

### 19.

The admission in evidence of the four letters purportedly written by Frank Kimball—Exhibits 66, 67, 68, and 69—was an error so serious and prejudicial as—standing alone—to require remand for a new trial.

■ The basic error is the admission of the four letters without any *authentication* whatever. There was no proof that Frank Kimball wrote any of the letters, that any of them were ever sent, or that Angelica ever received or saw any of them.

Authentication, as applied to writings offered in evidence, is a requirement that the writing be proved by evidence to be what it is supposed to be; it is "a necessary preliminary to the introduction of most writings in evidence" (McCormick on Evidence, 3d ed., 686). Rule 901 of the Federal Rules of Evidence is entitled "Requirement of Authentication or Identification." Rule 901(a) is as follows:

(a) General provision. The requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims.

There was *no* evidence that the four letters purporting to have been written by Frank Kimball (Exhibits 66, 67, 68, and 69) were what their "proponent" (plaintiff Mayer) claimed them to be.

To attempt to provide such evidence, counsel for plaintiff Mayer first moved in evidence (T 528) Plaintiff's Exhibit 158 [for identification], the "response to request for admissions" signed by Frank Kimball under date of May 12, 1984 and earlier described herein.

Counsel for plaintiff Mayer had known all along that authentication of the four Kimball letters was necessary for them to be received in evidence. By means of the admissions procedure provided in Fed.R. Civ.P. 36, it was sought to secure authentication for the four Kimball letters. Rule 36 provides for service "upon any other party" of a "written request" for admissions. Rule 36 further provides that the matter is admitted unless a written answer or objection is made within 30 days after the request. There is no provision in Rule 36 for a "Response" to a Request for Admissions but doubtless such a document has been at times employed. In the case at bar, there was never any written request for an admission served for plaintiff Mayer on the Kimballs. Instead, in connection with the negotiation of a settlement with the Kimballs, counsel for plaintiff and counsel for the Kimballs in collusion worked out a combined Request and Response, as earlier described, which was designed to be used to authenticate the Kimball letters at the trial after the Kimballs had been dismissed from the action by reason of their settlement and could thereby evade cross-examination about the letters. Such was the origin of the "Response" document marked "Plaintiff's Exhibit 158."

There was vigorous objection from counsel for Angelica to the reception as evidence of the "Response," Exhibit 158 (T 529, 530). In the face of these objections, counsel for plaintiff Mayer then relied on the *deposition* of Kimball (Exs. 154, 155) as having identified the four Kimball letters (T 531). The claimed deposition identification was false, since Kimball did *not* there identify the letters; on the contrary, he gave no testimony whatever at his deposition, invoking his self-incrimination privilege against every question.

The trial judge then admitted the four Kimball letters into evidence without authentication (Exs. 66, 67, 68, and 69), apparently on the erroneous theory that statements made by a co-conspirator need not be authenticated. The ruling of the court was as follows (T 531):

They may be admitted pursuant to the statements made during the conspiracy by a co-conspirator.

This ruling led to the natural inquiry by counsel for Angelica (T 531):

Mr. Nelson: What statements is the Court referring to? I know of no statements made regarding those.

To which the court responded (T 531):

The Court: Statements contained within the documents.

This response makes plain that the trial judge mistakenly believed that a written statement purporting to be that of a co-conspirator is admissible without authentication under some exception to the "requirement of authentication" contained in Rule 901(a) of the Federal Rules of Evidence.

Thereupon the four Kimball letters (Exs. 66, 67, 68, and 69) were noted in the transcript as received in evidence (T 531).

**1340**

The transcript establishes that, while the "Response" of Frank Kimball ("Plaintiff's Exhibit 158") was designed as the foundation and authentication of the four Kimball letters, the "Response" was never received in evidence, was never filed as a pleading, and was never filed for any purpose in the district court clerk's office until an inquiry by this court, after argument of this appeal, led to its filing there on October 11, 1985, by some person unknown. While the original "Response" is labelled as "Plaintiff's Exhibit 158," the record fails to show that it was ever received in evidence. The trial judge admitted the four Kimball letters without *any* authentication.

■ Appellee Mayer argues to this court that Frank Kimball's assertion at his deposition (Ex. 154; received in evidence at T 528) of his fifth amendment privilege against self-incrimination in response to questions regarding the four letters led to "inferences" that "provided a foundation for the four letters." (Brief, p. 28). The only authority cited by Mayer to support the argument is *National Acceptance Co. of America v. Bathalter*, 705 F.2d 924 (7th Cir.1983). *Bathalter* held that "in a civil case a judgment imposing liability cannot rest solely upon a privileged refusal to admit or deny at the pleading stage" (*id.* at 932), and provides no support whatever for the plaintiff's argument. The *Bathalter* Court stated (*id.* at 929–30; emphasis supplied):

> [A]t trial a civil *defendant's* silence may be used *against him,* even if that silence is an exercise of his constitutional privilege against self-incrimination. Thus, if this case were to go to trial, [plaintiff] would be entitled to the benefit of an adverse inference against [defendant] if he declined to answer a question, and invoked his Fifth Amendment privilege, although [*Baxter v. Palmigiano*, 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976)] *does not hold that an adverse finding could properly rest on the silence, without other evidence.*

Because *Kimball's* silence (*not* Angelica's silence) is sought to be used against

*Angelica,* and because a foundation for the letters cannot "properly rest on the silence, without other evidence" of authenticity, we believe that plaintiff Mayer's reliance on *Bathalter* is misplaced and without merit.

■ The erroneous admission of the four Kimball letters caused serious prejudice to Angelica. The first letter (Ex. 66) was a demand by Kimball not to use his name in selling gems (although Kimball supplied all the gems sold by Kimberly) because he did "not wish to be held responsible for the sales-pitches that your salesmen use"; the letter stated that he was sending a copy to his attorney. The second letter (Ex. 67) threatens Angelica with "any action necessary" by Kimball's attorney if Angelica does not stop the use of Kimball's name (although Kimball was supplying all the gems being sold). The third letter (Ex. 68) referred to the sales prices of Angelica as "ludicrous" and "not right" and that Kimball did not "want any part of this." The fourth letter, not even claimed to have been sent to Angelica, was addressed to Kimball's personal attorney (Ex. 69) and under no theory would be admissible. This fourth letter states that Angelica and Small "are way out of line and want to break into jail."

Not only were these letters admitted without any authentication, but by reason of the artful maneuvers of counsel for Mayer, Angelica was deprived of any opportunity to cross-examine the author of the letters to show the circumstances in which they were written, the motives for writing them, the profits to Kimball from the sales to Mayer, and the like.

The four Kimball letters were heavily emphasized by counsel for Mayer in closing arguments (e.g. T 718, 719). The prejudice to Angelica is shown by the varying results of the litigation to date, reflected in judgments, payments, and dismissals as follows:

| | |
|---|---|
| Angelica | $897,753.97 (judgment after trial) |
| IGS | 809,000.00 (default judgment) |
| MacAllum | 809,000.00 (default judgment) |
| Rene Small (Dupont) | 809,000.00 (default judgment) |
| Frank and Anita Kimball | 35,000.00 (settlement payment) |

| Zvonkin | 15,500.00 (judgment after trial) |
| Terry | 7,500.00 (settlement payment) |
| Kimberly | 0.00 (dismissed) |
| Levitt | 0.00 (dismissed) |
| Steve Small | 0.00 (dismissed) |

That the erroneous admission of the four Kimball letters did prejudice Angelica, the only defendant affected by such letters, seems indicated by the enormous judgment against Angelica as contrasted with, for example, the amount for which the plaintiff settled with Frank Kimball, author of the letters, and far more involved in the enterprise and for a far longer time than was Angelica. It must also be kept in mind that the evidence showed Mayer to be out of pocket from the transactions in suit no more than $81,000, while the judgment of the trial court against Angelica alone is nearly $900,000.

There was very little evidence that Angelica had anything to do with any sales to Mayer or that he was guilty of any wrongdoing.

There was evidence that Angelica was "co-owner and co-president" of Kimberly. This is true but means little since Kimberly was but a selling agent for Kimberly Gems, which supplied all the gemstones sold (including those sold to plaintiff). Kimberly Gems was wholly owned by Frank Kimball who was paid $800,000 for stones in 1982 and $700,000 for stones in seven months of 1983 (T 317–19) and was frequently in the offices of Kimberly (T 315). Steve Small was also co-owner and co-president of Kimberly, was in charge of sales (T 348), was dismissed from the action on consent of the plaintiff, has paid nothing by way of settlement, and has no judgment against him.

There was evidence that Mayer spoke by telephone to Angelica as Babs and Burns. Mayer so testified, but said that in the one conversation with each, nothing was discussed about purchases by Mayer of stones and nothing was said which would show any wrongdoing by Angelica (T 128–133, 144–45).

There was evidence that Angelica and Steve Small were in charge of "training the Kimberly salesmen." The same evidence was that Small was basically in charge of sales and Angelica of administration; there was no evidence as to what training either gave (T 348).

The four Kimball letters, purporting to have been addressed to Angelica, were additionally prejudicial to him because they are the *only* evidence connecting Angelica with *any* sales of gemstones claimed to be fraudulent. In the closing arguments to the jury, counsel for Mayer relied heavily on the Kimball letters, reading excerpts, and especially emphasizing that gem prices were "ludicrous" and, from a letter of Kimball to his own attorney, that Angelica and Small "want to break into jail" (T 719, also 718).

Because of the erroneous admission of the four Kimball letters, simple fairness requires that the orders and judgments against Angelica be reversed and a new trial directed of the claims against him.

The orders and judgments entered on the docket on May 23, 1984, and on August 6, 1984, against Steve Angelica are reversed and the action is remanded to the district court for a new trial of the claims of David P. Mayer against Steve Angelica.