**SOUTH CENTRAL BANK AND TRUST COMPANY, Plaintiff,**

v.

**CITICORP CREDIT SERVICES, INC., Defendant.**

**CITICORP CREDIT SERVICES, INC., Third Party Plaintiff,**

v.

**FCC NATIONAL BANK, Third Party Defendant.**

No. 92 C 3585.

United States District Court, N.D. Illinois, Eastern Division.

Aug. 24, 1994.

---

636

Phillip Leon Stern, Freeman, Freeman & Salzman, P.C., Chicago, IL, Deborah H. Bornstein, Sherman Paul Marek, John Thomas Roache, Gardner, Carton & Douglas, Chicago, IL, for plaintiff South Cent. Bank and Trust Co.

Alan L. Fulkerson, Brian W. Norkett, Riordan, Larson, Bruckert & Moore, Chicago, IL, for defendant and third-party plaintiff Citicorp Credit Services, Inc.

Lynn Adrian Goldstein, Julie A. Lepri, First Nat. Bank of Chicago, Chicago, IL, for third-party defendant FCC Nat. Bank.

## MEMORANDUM OPINION AND ORDER

CASTILLO, District Judge.

Plaintiff South Central Bank and Trust Company ("South Central") sues defendant Citicorp Credit Services, Inc. ("CCSI") for breach of contract and breach of fiduciary duty owed by a principal to its agent. The parties' cross-motions for summary judgment are before the court. For the reasons set forth below, South Central's motion for summary judgment is denied and CCSI's motion for summary judgment is granted.

### BACKGROUND

The undisputed facts gleaned from the parties' Local Rule 12 Statements and accompanying exhibits are as follows.[1] South Central is an Illinois banking corporation. CCSI is a Delaware corporation engaged in, among other things, the business of providing credit card transaction services to banks and merchants. Under the terms of an agreement captioned "Bankcard Agreement Agent Bank" (the "Bankcard Agreement"), South Central acted as CCSI's agent in soliciting, maintaining, and servicing "Merchant Agreements."[2] Plaintiff's 12(M) Facts, Exh. 1, Bankcard Agreement ("In order to increase merchant acceptance of bank cards, other banks may act as agents for FCC in soliciting merchant agreements."). The Mer-

chant Agreements permitted merchants to participate in the Visa and/or MasterCard system—thereby enabling the merchants to accept payment by Visa and/or MasterCard bankcards ("bankcards") issued by member banks, and to deposit the sales slips generated through the use of bankcards to their accounts with the agent bank. *Id.*

The present dispute between South Central and CCSI ultimately concerns which of these two parties will bear the cost of cardholder refunds ("chargebacks") associated with a certain merchant, American–European Express ("AEE"), which is now in bankruptcy. South Central, in its capacity as an agent bank, entered into a Merchant Agreement with AEE and submitted an application on AEE's behalf to CCSI which CCSI approved. Plaintiff's 12(M) Facts ¶¶ 9, 14. The application stated that AEE was a railroad and contained the Standard Industrial Classification ("SIC") for railroads (4011).[3] *Id.* ¶ 9. South Central also included the SIC code for mail order houses (5961). *Id.*

AEE operated two railroad lines. *Id.* On June 21, 1991, an AEE train derailed in Indiana, substantially impairing AEE's ability to perform. *Id.* ¶ 29. Nevertheless, AEE continued, through October 1991, to accept payment by bankcard for services to be rendered at a later date—but which ultimately were never performed. *Id.* AEE electronically processed the bankcard charges directly through CCSI. *Id.* Cardholders who had paid for future AEE services with bankcards but did not receive such services were enti-

---

1. Because the parties have filed cross-motions for summary judgment, each party, as moving party, has filed a Local Rule 12(M) statement of material facts as to which there is no genuine dispute as well as a Local Rule 12(N) statement in response to the other party's Rule 12(M) Statement. South Central and CCSI's Local Rule 12(M) statements shall be referred to as Plaintiff's 12(M) Facts and Defendant's 12(M) Facts, respectively. Similarly, their Local Rule 12(N) statements shall be referred to as Plaintiff's 12(N) Facts and Defendant's 12(N) Facts, respectively.

2. South Central had initially entered into the Bankcard Agreement with FCC National Bank ("FCC"); however, CCSI subsequently purchased the Bankcard Agreement as part of an Asset Purchase Agreement. Defendant's 12(N) Facts ¶ 2. CCSI admits that it had a contractual relationship with South Central which was gov-

erned by the terms of the FCC Bankcard Agreement. *Id.,* ¶ 1. For ease of exposition, this opinion will treat the Bankcard Agreement as being entered into by and between South Central and CCSI unless the context requires otherwise.

3. The SIC coding system is a standardized means of classifying business establishments by type of activity in which they are engaged. *See Standard Industrial Classification Manual,* Executive Office of the President, Office of Management and Budget (1987 ed.) at 11. The classification system was developed "for purposes of facilitating the collection, tabulation, presentation, and analysis of data relating to [business] establishments; and for promoting uniformity and comparability in the presentation of statistical data collected by various agencies of the United States Government, State agencies, trade associations, and private research organizations." *Id.*

tled to refunds. *Id.* ¶ 30. As the Principal Bank that processed AEE's charges, CCSI was required to make the refunds to the Principal Banks that had issued credits to these cardholders. *Id.* In turn, CCSI charged these refunds back to South Central by withholding sales slip proceeds—unrelated to AEE—from South Central amounting to $173,386.27, contending that South Central was liable for AEE-related chargebacks under the terms of the Bankcard Agreement.[4] *Id.* ¶ 31.

The Bankcard Agreement permits CCSI, in some instances, to require South Central to pay chargebacks when refunds are due from merchants whose applications South Central submitted. *Id.* ¶ 7. In turn, South Central may attempt to collect the refunds from the merchant involved; if the merchant is unwilling or unable to pay, South Central bears the loss. *Id.*

The Bankcard Agreement contains certain provisions for pre-screening merchants by the agent banks, apparently as a means of ascertaining creditworthiness and filtering out unacceptable risks. In particular, the Bankcard Agreement provides:

> Before entering into a merchant agreement with a merchant, [the agent bank] must comply with the following minimum requirements:
>
> 1) Ascertain from available records, independent reports and other available means that the prospective merchant is financially responsible and that there is no significant derogatory background information about any of the principal(s) of the business,
>
> 2) Conduct an actual on-site inspection of the business. If sales slips will be generated as a result of either mail or telephone orders, a detailed description of the business must be obtained.

Plaintiff's 12(M) Facts, Exh. 1, Bankcard Agreement ¶ I.C.

The allocation of the risk of credit loss, and risk-management procedures, were further described in various documents issued by CCSI to South Central in July 1990 ("the July 1990 Materials") after CCSI purchased FCC's merchant credit card processing portfolio. Because both parties rely on the July 1990 Materials to a significant degree in bringing and opposing the present motions for summary judgment,[5] we quote the materials in some detail.

In a document entitled: "MERCHANT ACCEPTANCE PROCEDURES," CCSI states, in pertinent part:

> As there have been no material changes to MasterCard and Visa Association rules relative to merchant acceptance procedures, your internal processes will remain essentially unchanged. In an effort to protect your interests and as a reminder, we offer you these Association mandated steps and our suggestions which should be followed prior to submitting a new Merchant Application:
>
> 1. Conduct a personal visit to the merchant location to verify that it is a bonafide [sic] business capable of operating in the manner described.
>
> .     .     .     .     .
>
> 3. Conduct a full background check on the business and its owners or principals. This may include such steps as obtaining business (i.e. D & B) and personal Credit Bureau reports (i.e. TRW), checking credit and trade references, reviewing banking relationships, etc. . . .
>
> 4. Evaluate the risk-return trade off associated with each potential merchant based upon the results of the credit review. This is of primary importance when deal-

---

**4.** South Central originally sued CCSI for this $173,386.27 amount. However, as the result of a successful motion for partial summary judgment on a different breach of contract count in the amended complaint (Count V), South Central has now recovered $48,088.81 of the amount in dispute. Additionally, by set-off from AEE's account, South Central recovered $20,561.78 from AEE, leaving an amount of $104.735.68 in dispute.

**5.** In its Local Rule 12(M) statement, CCSI states: "The rights and obligations of the parties are governed by the Bankcard Agreement (Exhibit 4). Additionally, those rights and obligations of the Bankcard Agreement were reiterated in the July 1990 Materials." Defendant's 12(M) Facts ¶ 6. In response, "South Central admits that the rights and obligations of the parties are governed by the Agent Bank Agreement and the July 1990 Materials. . . ." Plaintiff's 12(N) Facts ¶ 6.

ing with high risk businesses. Risk in a bankcard processing environment comes primarily from two sources: credit risk, if a business is not viable over the long term, resulting from unprocessed refunds, customer disputes and non-delivered goods/services and fraud risk. The risk posed by a prospective client must be carefully evaluated, especially when a cardholder does not receive the goods or services at the time the card and/or card number is presented for payment.

Defendant's 12(N) Facts, Exh. 5 at HNDBK/(13). In the "MERCHANT APPLICATION PROCEDURES AND GUIDELINES," CCSI states, in pertinent part:

> Given the everchanging bankcard processing environment, it is sometimes necessary to re-evaluate the credit policies and practices employed in merchant acceptance in order to avoid excessive risk.
>
> The following is designed as an update to your current merchant acceptance procedures with our focus being solely to protect you from unnecessary and avoidable financial risk.
>
> At Citicorp Card Acceptance Services, we take risk management seriously and have developed some very proactive programs which we believe will help to insulate you from the extraordinary losses being experienced by merchant banks throughout the industry. Association statistics reveal that a single fraud event can cause up to a seven figure loss episode; therefore, due care must be exercised when contracting with any merchant for bankcard processing.

*Id.* at HNDBK/(14).

The "APPLICATION PROCESSING" document describes the processing of an application by CCSI as including:

> A) Review of application to insure that the merchant conducts an "acceptable business." See Acceptable Business Guidelines included in this package.
>
> B) Association mandated inquiry against the MasterCard/Visa Combined Terminated Merchant File (CTMF). The CTMF is a database maintained by acquiring institutions which contains information on merchants previously terminated for cause.

> C) An additional personal credit check of the owners and/or principal officers of the business may be performed.
>
> D) Approval from Citicorp Card Acceptance Services Credit Unit after review of the above.

*Id.* at HNDBK/(15). The "ACCEPTABLE BUSINESS GUIDELINES" provide that:

> At Citicorp Card Acceptance Services, we take a proactive approach to risk management to minimize the likelihood of a significant financial loss to our client banks. We remain very involved in industry fraud and security organizations to keep abreast of extraordinary risk industries and developing fraud patterns.
>
> While we fully understand that you, our client banks, assume all credit and fraud risk for merchants which you sponsor, there are instances where a merchant's line of business may be prohibited by Association Rules or may present more of a risk than can be safely assumed by CCAS or a sponsored client bank. These types of merchants are termed "unacceptable."
>
> The following is an updated version of our "Unacceptable Business" list.... Given that each bank assumes its own merchant liability, you may wish to add additional categories based on your own experience and/or policies.

*Id.* at HNDBK/(16). The "UNACCEPTABLE BUSINESS" list identifies "Travel agents/tour operators" and "Telephone order/mail order (less than two years in operation or previous non acceptors of bankcards)," among other businesses, as unacceptable businesses. *Id.* at HNDBK/(17).

South Central contends that CCSI breached the Bankcard Agreement by failing to follow certain policies and procedures—which, South Central believes, CCSI was obliged to follow under the July 1990 Materials—designed to limit South Central's exposure to loss. In particular, South Central contends that CCSI breached the Bankcard Agreement by:

> (1) failing to conduct a reliable review of AEE's application; (2) failing to reject AEE on the basis that it was classified as a

Travel agent/tour operator; (3) failing to notify South Central that AEE was classified as a Travel Agent/Tour Operator, and was therefore an extremely high risk Unacceptable Business that should be rejected; and (4) failing to take remedial action after a CCSI security unit confirmed that AEE was classified as a Travel Agent/Tour Operator and was therefore an extremely high risk Unacceptable Business.

South Central's Memorandum in Support of Motion for Summary Judgment at 9. South Central also contends that under agency law, CCSI had a duty to use care to inform South Central of the financial risks associated with acting as CCSI's agent. South Central further contends that CCSI breached this duty by failing to use care to inform South Central that (1) CCSI did not conduct a reliable review of AEE's application, and, (2) AEE was classified as a Travel Agent/Tour Operator and was therefore an Unacceptable Business that should be rejected. South Central argues that the undisputed evidence entitles it to summary judgment on both counts.

CCSI contends that it, not South Central, is entitled to summary judgment on the breach of contract claim because: South Central failed to perform the condition precedent of investigating AEE's financial condition and creditworthiness; South Central has presented no evidence of breach by CCSI; South Central's alleged injuries were not proximately caused by any alleged breach by CCSI; and, South Central has failed to establish that it incurred any damages. With respect to South Central's breach of fiduciary duty claim, CCSI also contends that it, not South Central, is entitled to summary judgment because South Central cannot establish that CCSI had any fiduciary duty of disclosure or that CCSI breached any such duty.

### DISCUSSION

*Summary Judgment Standard*

Summary judgment is proper only if the record shows that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). A genuine issue for trial exists only when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The court must view all evidence in the light most favorable to the nonmoving party, *Valley Liquors, Inc. v. Renfield Importers, Ltd.*, 822 F.2d 656, 659 (7th Cir.), *cert. denied*, 484 U.S. 977, 108 S.Ct. 488, 98 L.Ed.2d 486 (1987), and draw all inferences in the nonmovant's favor. *Santiago v. Lane*, 894 F.2d 218, 221 (7th Cir.1990). However, if the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. *Liberty Lobby*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11; *Flip Side Productions, Inc. v. Jam Productions, Ltd.*, 843 F.2d 1024, 1032 (7th Cir.), *cert. denied*, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988). In determining whether a genuine issue exists, the court "must view the evidence presented through the prism of the substantive evidentiary burden." *Liberty Lobby*, 477 U.S. at 254, 106 S.Ct. at 2513. In making its determination, the court's sole function is to determine whether sufficient evidence exists to support a verdict in the nonmovant's favor. Credibility determinations, weighing evidence, and drawing reasonable inferences are jury functions, not those of a judge when ruling on a motion for summary judgment. *Liberty Lobby*, 477 U.S. at 255, 106 S.Ct. at 2513–14.

*Breach of Contract*

Under Illinois law, a plaintiff must establish the following elements in order to prevail on a breach of contract claim: (1) the existence of a valid and enforceable contract; (2) performance by the plaintiff; (3) breach by the defendant; and (4) injury to the plaintiff resulting from the breach. *See Berry v. Oak Park Hosp.*, 256 Ill.App.3d 11, 195 Ill. Dec. 695, 700, 628 N.E.2d 1159, 1164 (Ct. 1993); *Nielsen v. United Servs. Auto. Ass'n*, 244 Ill.App.3d 658, 183 Ill.Dec. 874, 877, 612 N.E.2d 526, 529 (Ct.1993).

Although CCSI offers arguments ranging from South Central's failure to perform a condition precedent to South Central's lack of damages, the court finds it necessary to consider only one issue in order to dispose of the breach of contract claim—namely, whether CCSI failed to perform any obligation

imposed by the Bankcard Agreement or July 1990 Materials. If it did not, then there is no breach and CCSI would be entitled to judgment as a matter of law.

In ruling on CCSI's motion to dismiss South Central's breach of contract count, the court previously found that "the express terms of the Agreement clearly place the duty on South Central to investigate the financial condition of a merchant before submitting that merchant's application to the principal bank." *South Central Bank & Trust Co. v. Citicorp Credit Servs., Inc.,* 811 F.Supp. 348, 351 (N.D.Ill.1992).[6] South Central's breach of contract claim was not dismissed, however, because South Central alleged that, in negotiating the Bankcard Agreement, First Chicago had agreed orally to assume the responsibility of investigating the financial conditions of merchants and rejecting those not qualified. South Central further alleged that CCSI was aware of First Chicago's oral agreement and continued First Chicago's practice of investigating merchant applicants. *Id.*

Pretrial discovery apparently failed to bear fruit for South Central on the oral modification theory; South Central appears to have abandoned this theory and looks instead only to the language of the Bankcard Agreement and the July 1990 Materials as the source of CCSI's purported obligation to investigate merchants.[7] In particular, South Central looks to the APPLICATION PROCESSING page of the Materials wherein CCSI outlines the steps it takes in processing accounts including: "Review of application to insure

that the merchant conducts an 'acceptable business'" and "Association mandated inquiry against the MasterCard/Visa Combined Terminated Merchant File." CCSI does not dispute that it was required to perform these two obligations, *see* CCSI's Memorandum in Response to Plaintiff's Motion for Summary Judgment at 11 ("under the Bankcard Agreement and the July 1990 Materials, CCSI's only obligation in approving a merchant application was to (1) review the application to insure that the merchant conducted an 'acceptable business', . . . and (2) conduct an inquiry against the MCTMF"); rather, CCSI contends that it fully performed those obligations. *Id.*

■ Before examining whether a genuine issue of fact exists with respect to whether CCSI fully performed, the court notes that it has thoroughly reviewed the Bankcard Agreement and the July 1990 Materials in their entirety and finds that the Bankcard Agreement explicitly imposes on South Central the duty to: (1) conduct its own investigation into whether a merchant is financially responsible and/or whether there is any significant derogatory background information about any of the principals of the business; and (2) conduct an on-site inspection of the business. *See* Bankcard Agreement, Plaintiff's 12(M) Facts, Exh. 1 ¶ I.C.

Nothing contained in the July 1990 Materials relieves South Central of these obligations; and, nothing contained in the Materials imposes any additional duty on CCSI to conduct any other inquiry—other than those identified above—into the financial responsi-

---

**6.** This case was originally assigned to Judge Marovich's calendar. By order of the Executive Committee, it was reassigned to this court's calendar effective May 25, 1994.

**7.** In support of its counter-motion for summary judgment, CCSI submitted the affidavit of Alex Polischuk, who, while Agent Bank Manager at FCC, had responsibility for FCC's relationship with South Central. Subsequently, Polischuk took a position with CCSI where he was assigned the responsibility of overseeing CCSI's relationship with South Central. Polischuk attested that neither he nor, to his knowledge, anyone else at FCC:

> ever told, either orally or in writing, anyone at South Central . . . that FCC would fully investigate the financial condition of all merchants whose applications it received. In addition,

neither I nor, to my knowledge, anyone else at FCC National Bank ever indicated in any way to anyone at South Central that FCC National Bank's approval process would or should take the place of South Central's own investigation of the financial condition and creditworthiness of merchant applicants. To the contrary, I and to my knowledge, the other employees of FCC National Bank, always made it clear to agent banks, including South Central, that they had the responsibility and obligation to fully investigate the financial condition of merchant applicants and to evaluate the credit risk of such merchant applicants.

Defendant's 12(N) Statement, Exh. 3, Polischuk Aff. at 3, ¶ 3. South Central offers no evidence to refute this testimony.

bility or creditworthiness of merchants. The MERCHANT ACCEPTANCE PROCEDURES page plainly sets out various steps to be taken *by the agent bank* prior to submitting a new merchant application. The steps reiterate and elaborate the agent bank's obligations under the Bankcard Agreement such as conducting an on-site inspection of the merchant to verify that it is a bona fide business; conducting a full background check on the business and its owners or principals; and evaluating the risk-return trade-off associated with potential merchants based on the results of the credit review. While the July 1990 Materials contain language to the effect that they are designed to protect the agent bank's interests and have the sole focus of protecting the agent bank from unnecessary and avoidable financial risk[8], this language in no way imposes specific contractual obligations on CCSI to protect the agent banks from financial loss. Instead, the Materials reinforce the proposition that the agent banks were principally responsible for investigating merchants and carried the risk of loss. With the exception of the APPLICATION PROCESSING page, it is clear that the Materials served only to offer procedures *to be followed by the agent banks* for the protection of their own interests.

To the extent that CCSI was obligated to conduct an inquiry into the risk posed by the merchant applicant, that obligation was limited to: (1) reviewing the application to ensure that the merchant conducted an "acceptable business" and (2) conducting an inquiry against the MasterCard/Visa Combined Terminated Merchant File. There is no genuine dispute as to whether CCSI fully performed the latter obligation: The affidavit of Patrick Burke, who as CCSI's Vice President of New Account Processing had responsibility for overseeing the review of credit applications and determining whether or not to grant merchants credit processing privileges, states that CCSI conducted the inquiry against the Terminated Merchant File and that the inquiry did not find any previous termination for cause of AEE. Defendant's 12(N) Facts, Exh. 1, Burke Aff. ¶ 20. South Central presents no evidence to refute this fact. Thus, South Central's breach of contract claim turns on whether CCSI should have rejected AEE as being an unacceptable business.

■ South Central contends that AEE was an unacceptable business because it was a railroad and was classified as a travel agent/tour operator and that CCSI breached its duties by failing to reject AEE on this basis. In support of its contention that AEE was an unacceptable business, South Central submits two principal pieces of evidence: (1) CCSI's Response to South Central's Second Set of Interrogatories in which CCSI states that the SIC code for railroads is an unacceptable SIC code (Plaintiff's 12(M) Facts, Exh. 7); and (2) a draft letter from CCSI that was never sent containing a crossed-out sentence stating that AEE could be classified as a Travel agent/tour operator (Plaintiff's 12(M) Facts, Exh. 8).

■ With respect to the former, CCSI has submitted three affidavits stating that "[a]ny answers to interrogatories filed in this case indicating that the SIC code for railroads 4011 is unacceptable was in error and the result of an inadvertent typographical mistake." Defendant's 12(N) Facts, Exh. 1, Burke Aff. ¶ 17; Exh. 2, Richman Aff. ¶ 11; Exh. 11, Norkett Aff. ¶ 5. Additionally, after

---

8. South Central identifies the following language, selectively abstracted from the July 1990 Materials, as indicating that CCSI had an affirmative duty to screen applicants and minimize South Central's exposure by rejecting those that presented an extremely high risk of loss:

The following is designed as an update to your current merchant acceptance procedures with our focus being solely to protect you from unnecessary and avoidable financial risk.

At Citicorp Card Acceptance Services, we take risk management seriously and have developed some very proactive programs, which we believe will help insulate you from the extraordi-

nary losses being experienced by merchant banks throughout the industry.

We are committed to adhering to these standards and providing you a reliable, accurate, fraud preventive procedure for merchant set-up.

At Citicorp Card Acceptance Services, we take a proactive approach to risk management to minimize the likelihood of a significant financial loss to our client banks.

We want to be receptive to your needs while protecting you from unnecessary financial risk.

Plaintiff's 12(M) Statement, Exh. 4, July 1990 Materials.

discovering this mistake, CCSI subsequently served upon South Central amended answers to the interrogatories stating that "4011 was an acceptable SIC code." Defendant's 12(N) Facts, Exh. 19.[9] Further, Patrick Burke, Vice–President of New Account Processing at CCSI, attested that:

> A railroad is an acceptable business. A railroad provides the same type of service as cruise lines or airlines and there is nothing unacceptable about such businesses as a general matter. CCSI has never considered a railroad, as a general category, an unacceptable business. Nor has CCSI ever represented to any agent bank that a railroad is an unacceptable business. CCSI has never refused to grant an agent bank credit processing privileges for an indirect merchant solely because the indirect merchant was a railroad.

Defendant's 12(N) Facts, Exh. 1, Burke Aff. ¶ 17. Larry Richman, Director of Security or Assistant Vice–President, Security, Collections & Accounts Processing Manager at CCSI, attested to the same. Defendant's 12(N) Facts, Exh. 2, Richman Aff. ¶ 11.

Citing *Donohoe v. Consolidated Operating & Prod. Corp.*, 982 F.2d 1130 (7th Cir.1992), South Central contends that the court should reject Burke, Richman and Norkett's affidavits insofar as they attempt to contradict CCSI's original interrogatory answers. In *Donohoe*, the Seventh Circuit found no error in the district court's refusal to consider an affidavit submitted as evidence accompanying a motion for summary judgment where the affidavit contradicted the affiant's earlier answers to interrogatories. *Id.* at 1136 n. 4. However, it is significant to note that the

trial court in *Donohoe* also stated that, "[i]t is well settled that in determining whether a material issue of fact exists a court may not exclude consideration of an affidavit simply because of some conflict with the affiant's prior sworn testimony." *Donohoe v. Consolidated Operating & Prod. Corp.*, 736 F.Supp. 845, 861 (N.D.Ill.1990). The *Donohoe* trial court struck the affidavit evidence only after finding that the affiant offered "no justification" for the inconsistency between the affidavit testimony and earlier responses to special interrogatories, *id.* at 862, and that the affidavit constituted an attempt to create a sham fact issue. *Id.* at 863.

In the instant case, the court cannot conclude that Burke, Richman, and Norkett's affidavit testimony constitutes such an attempt. All three affiants attested that CCSI's earlier interrogatory answers were the erroneous result of a transposition of words. Moreover, as noted above, upon discovering the error, CCSI served amended answers to the interrogatories correcting the error. Further, CCSI's contention that the original interrogatory answers were the product of mistake is partially supported by the "UNACCEPTABLE BUSINESS" list provided to South Central as part of the July 1990 Materials, wherein CCSI specifically identifies Telephone order/mail order businesses (corresponding to a SIC code of 5961) as unacceptable businesses. Plaintiff's 12(M) Facts, Exh. 4, July 1990 Materials at HNDBK/(17).

■ Under these circumstances, and in the absence of any evidence suggesting that the original interrogatory answers were not the result of a typographical error,[10] or sug-

---

9. In its second set of interrogatories, South Central asked:

> 2. With respect to the "First Card Merchant Application" submitted to Citicorp for AEE … state:
>
> .     .     .     .     .
>
> d.   whether a business with the "SIC Code" of "4011" was an "acceptable business" by Citicorp standards at the time this application was submitted, and the basis for this conclusion;
> e.   whether a business with the "SIC Code" of "5961" was an "acceptable business" by Citicorp standards at the time this application was submitted, and the basis for this conclusion.

Plaintiff's 12(M) Statement, Exhibit 7, CCSI's Response to South Central's Second Set of Interrogatories. CCSI provided the following answer:
> d.   4011 was an unacceptable SIC code.
> e.   5961 was an acceptable SIC code.

*Id.* The amended answer reads:
> d.   4011 was an acceptable SIC code.
> e.   5961 was an unacceptable SIC code.

Defendant's 12(N) Statement, Exhibit 19, CCSI's Amended Response to South Central's Second Set of Interrogatories.

10. Indeed, South Central has effectively admitted that the original interrogatory answers were the result of error. CCSI's 12(M) statement includes

gesting that the affidavits in question were mere fabrications aimed at creating a sham issue, the court finds that CCSI's original interrogatory answers do not raise a triable issue of fact as to whether CCSI considered railroads to be an unacceptable business.

■ The other piece of evidence submitted by South Central to establish that AEE should have been rejected by CCSI is an unsigned draft letter, by an unknown author, dated December 11, 1991, addressed to Marc B. Grayson, President of South Central Bank. The letter was provided to South Central in response to a request for production of documents. It is stamped **"DRAFT,"** and is marked-up with handwritten proof-reading/editorial revisions. The letter discusses the AEE dispute in general terms and sets forth some of CCSI's positions as to why Citicorp is unwilling to assume the losses associated with AEE. One paragraph of the letter sets out some of the events connected with CCSI's conversion of FCC agent banks to CCSI agent banks as follows:

> In July of 1990, after the acquisition of the FCC portfolio, we did a mailing to all of our agents that recapped some changes in procedures and forms as it relates to our Agent Bank Merchant Program. This mailing was sent to Mr. Bob Ribordy, who is listed as our primary contact.... At the first of several conversion meetings, Al Polischuk and Sharon Basso met with Bob Ribordy, Ed Bettenhauser, and Jackie. At this time we once again presented them with this procedure document. One of the key portions of this document is our updated policy for Merchant Acceptance Criteria which clearly states the risk posed by a prospective client when a cardholder does not receive goods or services at the time the card is presented for payment. Our Unacceptable Business list reflects Travel

Agents/Tour Operators which American European Express can be classified as. Plaintiff's 12(M) Facts, Exh. 8. In addition to two insignificant editorial revisions elsewhere in the paragraph, the entire last sentence is crossed-out. South Central looks precisely to the crossed out sentence as evidence that CCSI regarded AEE as a Travel agent/tour operator—an unacceptable business.

CCSI has filed a separate motion to strike the draft letter to which we now turn our attention. In its motion to strike, CCSI contends that the draft letter is unauthenticated and hence inadmissible. CCSI also contends that "[a] draft letter never adopted or transmitted by its author is hearsay and inadmissible." CCSI Motion to Strike South Central's Exh. 8 at 2. Also, anticipating the response that the statement is an admission and therefore not hearsay, CCSI asserts that the letter cannot be deemed an admission because South Central has laid no foundation as to who the letter's author was and whether the author had authority to make the statement. Finally, CCSI contends that the crossed out sentence cannot be regarded as an admission because a crossed out writing cannot be considered an assertion.

South Central cites *United States v. Brown*, 688 F.2d 1112 (7th Cir.1982), as support for the proposition that the mere act of producing documents during discovery is sufficient to authenticate the documents. In *Brown*, the defendant (Brown) was subpoenaed to produce certain records of the business of which he was the president and sole stockholder. During a pretrial hearing, Brown refused to authenticate the documents asserting his fifth amendment privilege; instead, two government witnesses, an assistant United States attorney and an FBI special agent, identified the documents and testified that they were produced by Brown's

a paragraph asserting that its original interrogatory answers were the result of error. Defendant's 12(M) Facts ¶ 30 (citing the Burke, Richman, and Norkett affidavits). South Central's response states, "South Central has no knowledge as to Citicorp's allegations and therefore denies same." Plaintiff's 12(N) Facts ¶ 30. This sort of boilerplate language may be adequate for an answer to a complaint, but it is insufficient to controvert a properly supported statement in a

moving party's Local Rule 12(M) statement. Local Rule 12(N) requires a response to the movant's statement "including, in the case of any disagreement, specific references to the affidavits, parts of the record, and other supporting materials relied upon." Local Rule 12(N)(3)(a). Because South Central does not properly or adequately controvert CCSI's statement, the fact will be deemed admitted. Local Rule 12(N)(3)(b).

attorney who stated that they were the documents which had been subpoenaed. Following his conviction, Brown appealed arguing that the documents were. not properly authenticated. The Seventh Circuit rejected the argument as "totally without merit." *Id.* at 1116. The court observed that "[e]ven Brown admits that if he had produced the documents personally in response to the subpoena, the very act of producing them and representing them to be the documents described in the subpoena would have authenticated them.... Once he voluntarily produced the documents and implicitly represented them to be [the business's] records, he cannot be heard to contend that they are not [the business's] records." *Id.* The court explicitly found the act of producing the documents to be "implicit authentication": "Brown produced the documents voluntarily and, as an officer of the corporation, he was in a position to vouch for their authenticity. Just as he could have identified the records by oral testimony, his very act of production was implicit authentication." *Id.*

While CCSI makes no effort to distinguish *Brown*—or otherwise explain why *Brown* should not control the issue of whether the draft letter was implicitly authenticated by CCSI's act of producing the letter—it does cite *Mayer v. Angelica*, 790 F.2d 1315 (7th Cir.1986), in support of its position that the mere fact of CCSI's production is insufficient authentication and that "South Central has to prove who the author is and that the document was sent or received." CCSI Reply Brief at 10. In *Mayer*, the Seventh Circuit found reversible error where the trial court admitted into evidence certain letters without any authentication. *Id.* at 1338. The letters at issue were produced by the purported author in the course of discovery, *id.* at 1324, were signed with the name of the purported author, *id.* at 1323, and were written on stationary bearing the letter head of the business wholly owned by the purported author, *id.* at 1321, 1323. Despite these factors, the Seventh Circuit found that the letters were "without any authentication whatever." *Id.* at 1338. The Seventh Circuit found that the principal evidence that the proponent of the letters sought to introduce to authenticate the letters—admissions by

the author—was never received in evidence, *id.* at 1340, and certain deposition testimony by the purported author did not authenticate the letters because the deponent invoked his self-incrimination privilege on every question, *id.* at 1339.

Although CCSI's reliance on *Mayer* is not entirely misplaced, we believe that *Brown*, not *Mayer*, controls the issue at hand. *Brown* explicitly addresses the issue of whether the act of production may be sufficient authentication of a writing. As noted above, *Brown* held that it could. *Brown*, 688 F.2d at 1116. For whatever reason, this issue was never addressed or even raised in *Mayer*. In the absence of any indication that the Seventh Circuit intended—in *Mayer*—to overrule its previous holding on this issue, we are bound to follow the court's explicit holding that the production of a document amounts to an implicit authentication of the document. Furthermore, we disagree with CCSI's suggestion that *Mayer* holds that authentication of a document requires proof of who the author is and that the document was sent or received. *Mayer* does not so hold; although the court did observe that there was no proof that the purported author wrote any of the letters or that they were ever sent or received, *Mayer*, 790 F.2d at 1338, the court did not purport to set these factors out as requirements for authentication. Accordingly, for purposes of the present cross-motions for summary judgment, the court shall not strike the draft letter based on CCSI's arguments relating to authentication.

■ The court also rejects CCSI's contention that the draft letter does not constitute an admission and must be stricken as hearsay. CCSI correctly notes that an admission is defined as a "statement" of a party offered against that party. FED.R.EVID. 801(d)(2). A "statement," in turn, is defined as "an oral or written assertion." FED.R.EVID. 801(a). CCSI argues that "[a] sentence· that is crossed out by the author is not intended as an assertion but rather is the same as an unexpressed thought. The crossed out sentence was never conveyed to anyone and was never intended to be seen by anyone. In short, the crossed out sentence was never

adopted by anyone at CCSI, including the unidentified author." CCSI Motion to Strike at 3. The court disagrees. A crossed out sentence is not like an unexpressed thought; to the contrary, it is more like an expressed thought that someone sought to rescind or retract.[11] It is the written equivalent of a spoken statement followed by the words, "forget I said that." A statement, once made, is no less a statement simply because its maker has changed his or her mind. Thus, CCSI's contention that a crossed out sentence is not an assertion is meritless. Moreover, CCSI's assertion that the crossed out sentence was never conveyed or intended to be seen by anyone is simply not relevant. Secret diary entries, for example, are no less assertions or admissions simply because the author never intended to convey them to anyone.

In sum, for purposes of ruling on CCSI's motion to strike, the court finds that the fact that CCSI produced the draft letter suffices to authenticate the letter and establish that it was drafted by a CCSI agent acting within the scope of his or her employment at CCSI. The draft letter may be construed as an admission and hence is not inadmissible hearsay. FED.R.EVID. 801(d)(2). Finally, although CCSI's arguments succeed in significantly diminishing the probative value of the draft letter, the court cannot conclude that it is so lacking in probative value as to render it inadmissible. For the foregoing reasons, CCSI's motion to strike South Central's Exhibit 8 is denied.

Although the court denies CCSI's motion to strike, it also concludes that the draft letter—which is the *only* evidence presented by South Central on the issue—is, at most, marginal proof that at some unknown time CCSI considered AEE as falling within the travel agent/tour operator classification. As such, it is insufficient to raise a genuine issue of material fact as to whether CCSI considered AEE to be an unacceptable business on

that basis. *See Liberty Lobby,* 477 U.S. at 249–50, 106 S.Ct. at 2510–11.

South Central concedes, as it must, that the letter was only a draft that was never sent. More significantly, as CCSI argued in its motion to strike, South Central presents no evidence that CCSI ever actually reached the conclusion or adopted the position—crossed out in the draft letter—that AEE could be classified as a travel agent/tour operator. In view of the fact that the sentence in the draft letter indicating that AEE could be classified as a travel agent/tour operator was crossed out, a factfinder could not reasonably conclude by a preponderance of the evidence that CCSI classified AEE as a travel agent/tour operator. The fact that the sentence was crossed out supports the conclusion that CCSI rejected the position as much, if not more, than the existence of the sentence supports the conclusion that CCSI adopted the position. A crossed out sentence is entirely equivocal on the issue.

More importantly, Burke's affidavit states, and South Central does not dispute, that AEE's merchant application "clearly states that the nature of AEE's business was a railroad." Defendant's 12(N) Facts, Exh. 1, Burke Aff. ¶ 15. Burke further attests that in processing AEE's application, AEE was considered to be a railroad, *id.* ¶ 16; that "CCSI has never considered a railroad, as a general category, an unacceptable business," *id.* ¶ 17; and that "CCSI does not consider a railroad to be a 'travel agent or tour operator' or a 'travel club.'" *Id.* ¶ 19. The Richman affidavit also states that railroads are an acceptable business, and that CCSI has never considered a railroad, as a general category, to be an unacceptable business. Defendant's 12(N) Facts, Exh. 2, Richman Aff. ¶¶ 2, 11. South Central presents no evidence, besides the draft letter, refuting this testimony; and, as stated above, the draft letter is insufficient to raise a genuine issue as to whether CCSI considered AEE to fall within the travel agent/tour operator category.[12] Accordingly, the court finds no genuine

---

**11.** There is no evidence as to who crossed out the sentence, when it was crossed out, or the circumstances under which it was crossed out.

**12.** It is far from clear that either party paid any particular attention to the *Standard Industrial*

*Classification Manual* published by the Executive Office of the President, Office of Management and Budget, which provides definitions of the establishments with which SIC codes are associated. Nevertheless, the court notes, without at-

issue as to whether CCSI should have rejected AEE's application on the ground that CCSI classified AEE as a travel agent/tour operator.

South Central also contends that CCSI should have considered AEE to be an unacceptable business, and rejected its application, because AEE was a telephone and/or mail order house. The sole evidence South Central submits in support of this position is the Merchant Application that South Central submitted on AEE's behalf. The entry on the Application under the heading "NATURE OF BUSINESS (BE SPECIFIC)" reads "Railroad," Plaintiff's 12(M) Facts, Exh. 5, and the entry under the heading "SIC CODE" contains the code "4011," which is crossed out, and replaced by the code "5961." *Id.*[13]

South Central has submitted no evidence supporting the position that the SIC code entered by an agent bank on a Merchant Application controls, or should control, the Principal Bank's classification of the mer-

chant's business when determining whether the business is generally acceptable or unacceptable. Nor does South Central present any other evidence relating to how CCSI's "acceptable business" determination is or should be made. Stripped to its essence, South Central offers no more than an argument to the effect that since it wrote the SIC code for a mail or telephone order house on AEE's application, CCSI should have regarded AEE as such and rejected the application.[14] Significantly, however, South Central offers no evidence supporting the claim that AEE is properly considered a catalog or mail order house.[15]

Burke's affidavit explains CCSI's processing of the AEE application as follows:

11. In determining whether an indirect merchant is an "acceptable business", *the SIC code given in an application or otherwise was irrelevant.* The focus instead was on the nature of the business or service provided. Under certain circumstances, even "unacceptable businesses"

---

taching any weight, that the manual defines "travel agencies" as "[e]stablishments primarily engaged in furnishing travel information and acting as agents in arranging tours, transportation, rental of cars, and lodging for travelers." *Standard Industrial Classification Manual* at 280. "Tour operators" are defined as "[e]stablishments primarily engaged in arranging and assembling tours for sale through travel agents." *Id.* Neither railroads nor other transportation enterprises are included in the enumeration of specific types of travel agencies or tour operators.

13. The evidentiary record before the court sheds little light on why, or by whom, the SIC code for railroads (4011) was crossed out and replaced with the SIC code for catalogue and mail order houses (5961). The only evidence bearing on these entries can be found in CCSI's Response to South Central's Second Set of Interrogatories wherein South Central inquired:

2. With respect to the "First Card Merchant Application" submitted to Citicorp for AEE, . . . state:
a. why "4011" was written in the SIC/Industry field of the submitted application, and who made this decision;
b. why "4011" was crossed-out in the SIC/Industry field of the submitted application and replaced with "5961", and who made this decision.
Plaintiff's 12(M) Statement, Exhibit 7. In response, CCSI answered:

a. The application was filled out by South Central.
b. See answer to 2(a) above.
*Id.* South Central apparently does not dispute that it was the party responsible for entering the SIC code of 5961; in its Reply Brief South Central notes that "Citicorp 'disregarded' *South Central's inclusion* of an SIC code for a mail order house...." South Central's Reply at 5 (emphasis added).

14. It is worth noting that the Merchant Application expressly provides that "MO/TO REQUIRE COPY OF AD." Plaintiff's 12(M) Statement, Exhibit 5. Additionally, on the MERCHANT ACCEPTANCE PROCEDURES page of the July 1990 Materials, CCSI reminds agent banks "to include a copy of the advertising material and catalogs for mail/telephone order merchants." Defendant's 12(N) Statement, Exhibit 5, July 1990 Materials at HNDBK/(13). There is no indication in the evidence that South Central included any sort of advertising material with AEE's application.

15. "Catalog and Mail–Order Houses" (SIC Code 5961) are defined as follows in the *Standard Industrial Classification Manual*: "Establishments primarily engaged in the retail sale of products by television, catalog, and mail order." *Standard Industrial Classification Manual* at 332. Neither railroads nor other transportation enterprises (*e.g.*, airlines, cruise lines, bus services, etc.) are listed in the enumeration of specific types of catalog and mail-order houses.

would be granted credit processing privileges if the agent bank insisted and further information was provided.

. . . . .

15. The Merchant Application clearly states that the nature of AEE's business was a railroad.

16. That the nature of the business was important rather than the SIC code placed on the application is amply demonstrated by this particular Merchant Application. The Merchant Application originally had a SIC code of 4011 for railroads but this was scratched out and the SIC code of 5961 for mail order houses was put in. The original entry of 4011 for railroads was correct because AEE was a railroad and the entry of 5961 was incorrect. When this application was processed, the correct SIC code of 4011 was considered and the incorrect SIC code of 5961 was disregarded.

Defendant's 12(N) Facts, Exh. 1, Burke Aff. ¶¶ 11, 15–16 (emphasis added). This testimony is unrefuted by any evidence submitted by South Central. In view of CCSI's unrefuted testimony that the SIC codes provided on Merchant Applications are "irrelevant" to its acceptable/unacceptable business determination; and, in view of the fact that South Central presents no evidence supporting the proposition that a railroad should properly be classified as a catalog or mail-order house for purposes of that determination, the court finds that South Central fails to raise a genuine issue as to whether CCSI should have classified AEE as a catalog or mail-order house and rejected its application on that basis.

In summary, South Central is not entitled to judgement as a matter of law on its breach of contract claim. Quite to the contrary, South Central's evidence is insufficient to raise a triable issue as to whether CCSI considered railroads generally to be unacceptable businesses; whether CCSI considered AEE to be an unacceptable business because it fell within the tour operator/travel agent classification; whether CCSI considered AEE to be an unacceptable business because it was a catalog or mail order house; or whether CCSI failed to perform any duty it was obliged to perform under the Bankcard Agreement or the July 1990 Materials. Accordingly, summary judgment must be entered in favor of CCSI on Count I (Breach of Contract) of South Central's Complaint.[16]

*Breach of Fiduciary Duty*

In Count II, South Central alleges that the agency relationship created by the Bankcard Agreement imposed a duty on CCSI, as principal, to investigate and inform its agent South Central of adverse financial information concerning AEE. As authority for its position, South Central cites the Restatement (Second) of Agency which provides:

> Unless otherwise agreed, it is inferred that a principal contracts to use care to inform the agent of risks of physical harm or pecuniary loss which, as the principal has reason to know, exist in the performance of authorized acts and which he has reason to know are unknown to the agent.

Restatement (Second) of Agency § 435.[17] South Central contends that CCSI breached its duty to inform South Central of the risk of loss associated with acting as CCSI's agent by failing to use care to inform South Central (1) that CCSI did not conduct a reliable review of AEE's application, and (2) that AEE was classified as a travel agent/

---

16. Because the court finds no genuine issue as to whether CCSI breached its contract with South Central, we do not reach CCSI's arguments relating to whether its alleged breach was the proximate cause of South Central's purported injuries or whether South Central has suffered any damages at all.

17. South Central cites no Illinois Supreme Court (or appellate court) opinion adopting section 435 of the Restatement as the governing law in Illinois. The only authority cited by South Central in support of its reliance on section 435 is *Lawrence Warehouse Co. v. Twohig*, 224 F.2d 493 (8th Cir.1955)—mistakenly identified in South Central's briefs as a Seventh Circuit case. Because CCSI does not contest South Central's articulation of the governing standards, and because the Illinois Supreme Court has looked to the Restatement (Second) of Agency for guidance in other contexts, and because we find no reason to conclude that section 435 would not be followed by the Supreme Court of Illinois, we shall assume that this section of the Restatement sets out the applicable standard relating to a principal's duty of disclosure to its agent.

tour operator and was therefore an Unacceptable Business that should be rejected.

■ With respect to the latter claim, it should be clear from the discussion of South Central's breach of contract claim that South Central's evidence is insufficient to establish that CCSI regarded AEE as an unacceptable business. Thus, South Central is not entitled to judgment as a matter of law on its breach of duty claim insofar as it is premised on any notion that CCSI regarded AEE to be unacceptable—either as a travel agent/tour operator or as a catalog or mail order house. To the contrary, because the evidence establishes that CCSI at no time considered AEE to be an unacceptable business, CCSI is entitled to summary judgment on the breach of duty claim insofar as it is premised on the contention that CCSI should have rejected AEE's merchant application on that basis.

■ The other prong of South Central's breach of duty claim is premised on the contention that CCSI somehow inadequately screened AEE's application. South Central cannot prevail under this theory either. The undisputed evidence establishes that the Bankcard Agreement imposes the duty to investigate the financial ability and creditworthiness of merchants upon agent banks—in this case, South Central. *See* Plaintiff's 12(M) Facts, Exh. 1, Bankcard Agreement ¶ I.C. Nothing in the July 1990 Materials modifies or nullifies this duty. To the contrary, the July 1990 Materials repeatedly reinforce the facts that agent banks are responsible for investigating the financial responsibility and creditworthiness of merchants, that agent banks should exercise caution in conducting this investigation, and that agent banks assume the risk of loss for merchants that they sponsor.[18] *See* Defendant's 12(N) Statement, Exh. 5 at HNDBK/(13) ("risk posed by a prospective client must be carefully evaluated"), HNDBK/(14) ("due

care must be exercised when contracting with any merchant for bankcard processing"), HNDBK/(16) ("we fully understand that you, our client banks, assume all credit and fraud risk for merchants that you sponsor"). As the Restatement (Second) of Agency plainly recognizes, the principal's duty to inform its agent of the risk of pecuniary loss may be contractually modified: *"Unless otherwise agreed,* it is inferred that a principal contracts to use care to inform the agent of risks of ... pecuniary loss." Restatement (Second) of Agency § 435 (emphasis added). In view of the explicit allocation of responsibility for investigating merchant applicants, South Central may not look to an implied fiduciary duty as a basis for CCSI's liability.[19]

■ Even if the court were to find that CCSI owed an implied duty to South Central to inform it of the risk of pecuniary loss associated with acting as CCSI's agent, we cannot find that the evidence raises a genuine issue as to whether CCSI breached that duty. In the first place, the July 1990 Materials amply admonish South Central as to the risks associated with sponsoring a merchant and reiterate that South Central assumes the risk of loss resulting from merchants it sponsored. Second, the evidence establishes that CCSI conducted its inquiry into whether AEE conducted an acceptable type of business, as a general matter, and whether AEE had ever been terminated for cause from the MasterCard or Visa system. Both inquiries failed to reveal any basis for denying AEE's application. The real thrust of South Central's argument is that CCSI had an affirmative duty, above and beyond any contractual duty, to conduct some sort of investigation into AEE's financial ability or creditworthiness. South Central offers no basis for the court to conclude that CCSI had such an

18. To the extent that South Central contends that the July 1990 Materials "actively misled South Central into believing that South Central's exposure to loss was being minimized when in fact it was not," the court finds no support for this contention.

19. In denying CCSI's motion to dismiss South Central's breach of duty claim (Count II), the court relied on South Central's allegation that

CCSI had assumed the duty to investigate and monitor the financial condition of merchants through an oral modification of the Bankcard Agreement. *South Central Bank & Trust Co. v. Citicorp Credit Servs., Inc.,* 811 F.Supp. 348, 352 (N.D.Ill.1992). As previously noted, there is no evidence in the record to support this allegation and it appears that South Central has abandoned the theory.

affirmative duty and the court finds no basis in law or fact to support this position.

The duty set forth in section 435 of the Restatement only extends to informing the agent of risks of pecuniary loss that the principal has reason to know exist in the performance of the agent's authorized acts and which the principal has reason to know are unknown to the agent. In the instant case, no evidence even remotely suggests that CCSI had reason to know of any unusual risk posed by AEE; nor does any evidence suggest that CCSI had knowledge of risk associated with AEE that was unknown to South Central.

■ Finally, South Central implicitly invites the court to infer that CCSI breached its duty to South Central based on the fact that while CCSI conducted no investigation into the creditworthiness of AEE, it did conduct an analysis of whether South Central could safely handle the losses potentially associated with merchants in the railroad industry. South Central complains, and CCSI admits, that South Central "was not privy to this evaluation." Plaintiff's Reply in Support of Motion for Summary Judgment at 4; Defendant's 12(N) Facts ¶ 21.

Patrick Burke described CCSI's evaluation as follows:

> [T]o protect CCSI's *own* interests and minimize its *own* risks of loss, and *not* that of the agent bank, CCSI would evaluate the risk of the *generic* type of business performed by the indirect merchant as well as the credit worthiness of the agent bank. Pursuant to the applicable contract, the agent bank should have already itself determined the credit risks associated with the particular merchant; therefore, CCSI, was not interested in investigating the particular merchant itself. Instead, CCSI conducted the evaluation to minimize the risk of loss involved in the foundering of *the agent bank*, not the merchant. In other words, if the agent bank were taken over by the Resolution Trust Corporation . . ., CCSI would be left with any liability

and CCSI wanted to minimize that risk *to itself* in such an event.

> To do so, CCSI first determined the potential credit risk of the *type* of business the indirect merchant was in and compared that with the resources and credit worthiness of the agent bank. The potential credit risk of the indirect merchant was determined by a risk algorithm which consisted of a factor assigned to a particular SIC code multiplied by the sales volume of the indirect merchant. (The SIC code was used for internal tracking purposes and was associated with a risk factor for a *generic* type of business; it was irrelevant to the potential credit risk of a particular merchant.) This figure would then be compared against the resources and credit rating of the agent bank to determine whether the agent bank could safely handle any losses . . . .

Defendant's 12(N) Statement, Exh. 1, Burke Aff. ¶¶ 12, 13.

South Central contends that CCSI breached its duty by not disclosing to South Central the "risk factors" or weightings that CCSI assigned to businesses when employing its risk algorithm. The court cannot conclude that CCSI's failure to disclose this information raises a genuine issue of material fact. Significantly, South Central does not even purport to argue that the railroad industry risk factor used by CCSI indicated a high degree of risk or that South Central had any risk algorithm of its own with respect to which CCSI's risk factors would have been material or useful.[20] In the absence of any showing that the undisclosed risk factors would have been material to South Central's determination to sponsor AEE, a factfinder could not reasonably find a breach of duty in CCSI's failure to disclose the risk factors.

In sum, the court finds that the Bankcard Agreement specifically allocated the burden of investigating the financial responsibility and creditworthiness of merchants to South Central. In light of such a contractual allocation, CCSI is relieved of any implied duty to inform South Central of the pecuniary risks posed by particular merchants spon-

---

**20.** Even if South Central could show, which it does not, that the risk factor associated with the railroad industry as a whole was high, it would still be several steps removed from a reasonable inference that the risk associated with a very distinct subtype of railroad business—namely, a luxury passenger railway service—is commensurately high.

sored by South Central. Even if not relieved of such an implied duty, the court finds that the evidence submitted by South Central fails to raise a genuine issue as to whether CCSI committed any breach of duty. For the foregoing reasons, South Central's motion for summary judgment on Count II is denied and CCSI's cross-motion for summary judgment on Count II is granted.

### *CONCLUSION*

Defendant Citicorp Credit Services, Inc.'s motion to strike Plaintiff South Central Bank and Trust Company's Exhibit 8 [51–1] is denied. South Central Bank and Trust Company's motion for summary judgment (37–1) is denied. Citicorp Credit Services, Inc.'s motion for summary judgment [49–1] is granted. Judgment is entered in favor of Citicorp Credit Services, Inc. Because the court's entry of judgment in favor of Citicorp Credit Services, Inc. moots Citicorp's Third Party Complaint against FCC National Bank, that Complaint [22–1] is dismissed.